Pure Oil Company *v.* Shlifer, Appellant.

Argued October 4, 1934. Before TREX-
LER, P. J., KELLER, CUNNINGHAM, BALDRIGE, STADTFELD,
PARKER and JAMES, JJ.

*Robert Block,* for appellant.

*Daniel Lowenthal,* of *Fox, Rothschild, O'Brien & Frankel,* for appellee.

OPINION BY STADTFELD, J., December 18, 1934:

This appeal is from the action of the lower court in granting plaintiff's motion for judgment n. o. v. The facts (agreed upon by counsel for both parties as per agreement filed) are as follows: Plaintiff brought suit against the defendant upon a written guaranty or suretyship dated May 24, 1928, signed by the defendant, who, prior to that date, was president of the Intercity Oil Company, a corporation engaged in the sale of gasoline, oil, and petroleum products. On or about April 1, 1928, the stockholders of the Intercity Oil Company and the National Speedway Refining Company, which was also engaged in the sale of similar products, entered into an arrangement whereby the stockholders of the Intercity Oil Company acquired fifty per cent of the stock of the National Speedway Refining Company in exchange for fifty per cent of the stock of the Intercity Oil Company. The Pure Oil Company, plaintiff herein, through information obtained from the defendant, had knowledge of the aforesaid arrangement.

In May, 1928, the National Speedway Refining Company requested the plaintiff to sell and deliver to it

certain merchandise, but the plaintiff refused to extend credit or deliver the merchandise to it unless the plaintiff was first furnished with satisfactory written contracts of guaranty or suretyship. On or about May 24, 1928, the defendant, J. Shlifer, executed a contract of guaranty or suretyship on a printed form prepared by the plaintiff, providing, inter alia: "It is further agreed that any forebearance or extension of time, by note or otherwise, granted by said The Pure Oil Company, its successors or assigns, toward or to the said buyer, in connection with any failure or neglect on the part of the said buyer to pay any such indebtedness, shall not in anywise release or exonerate us or either of us, or either of our heirs, executors or administrators, it being specifically agreed and understood that this guaranty shall extend and apply to any notes or other evidences of indebtedness given by the buyer to the said The Pure Oil Company to cover any such indebtedness."

At about the time when the defendant executed the above contract of suretyship, the plaintiff requested similar guaranties from one Joseph Handler and one Samuel Wenograd, president and treasurer, respectively, of the National Speedway Refining Company; and on May 24, 1928, the said Handler and Wenograd executed printed forms of guaranty or suretyship similar in form to that executed by defendant.

In June, 1930, the National Speedway Refining Company and the Intercity Oil Company terminated the above stockholders' arrangement. H. J. Walter, assistant sales manager for the plaintiff, who was in charge of wholesale marketing in the Philadelphia district, and who had had business relations with the National Speedway Refining Company and the Intercity Oil Company on behalf of the plaintiff, knew of the termination of this arrangement. Subsequently, to wit, on December 24, 1930, the plaintiff sold to the

National Speedway Refining Company one tank car of kerosene, $490.74, and on January 5, 1931, one tank car of kerosene, $490.26; the terms of the said sales being one per cent ten days, net forty-five days.

In July, 1931, after the date for payment of the above merchandise had passed, the National Speedway Refining Company, being in financial difficulties, eleven creditors thereof, including the plaintiff herein, entered into a written agreement of extension whereby they agreed not to press their claims against the National Speedway Refining Company for the definite period of six months from August 28, 1931.

Under this extension agreement the stockholders of the National Speedway Refining Company undertook to assign to trustees, who were also parties to the agreement, all their holdings in the company and in certain other subsidiary corporations, and further vested in the trustees the right to grant the company further extensions of six-months periods, if in the discretion of the trustees they deemed it advisable. The creditors agreed not to take any legal action for the collection of the indebtedness of the National Speedway Refining Company to them. The trustees were also given the right on a specified contingency to liquidate the assets of the company.

Before signing this agreement of extension, the plaintiff requested the said Joseph Handler and Samuel Wenograd to sign written waivers wherein they agreed that the execution of the creditors' extension agreement by the plaintiff should not operate to discharge Handler and Wenograd from their liability as guarantors or sureties. Handler and Wenograd executed the said waivers. The plaintiff, however, did not ask the defendant to sign such waiver.

Subsequently, when the National Speedway Refining Company became insolvent and was unable to pay said $981 due for the merchandise charged against it by

the plaintiff, the latter demanded payment from the defendant, and upon his refusal to pay, suit was instituted.

Defendant in his affidavit of defense filed admitted the sale and delivery of the goods and merchandise in question to the National Speedway Refining Company, but set up new matter denying liability on the ground that, because of the extension agreement hereinbefore referred to, he was released as surety. The case was tried by the court without a jury and a finding was entered for the defendant.

Plaintiff thereupon filed its motion for new trial which was dismissed, but its motion for judgment n. o. v. was granted in an opinion by CRANE, J., in which ROSEN, J., joined. A dissenting opinion was filed by the trial judge, GLASS. From the judgment so entered this appeal was taken.

The sole question in this case is whether the action of the plaintiff in joining in the creditors' extension agreement, without the joinder of the defendant, operated as a release of further responsibility by him under the contract.

As stated in the majority opinion, "A surety is not discharged by an extension of the time of payment or performance to which he consents, or where he consents in advance, or where the extension is permissible within the express provisions of the contract executed by the surety. (50 C. J. 151, Section 249, and Hay v. Hillegass, 275 Pa. 497)." We cannot, however, follow the majority opinion to the conclusion reached therein.

The agreement provided that *"any forbearance or extension of time,* by note or otherwise, granted by said The Pure Oil Company ...... toward or to the said *buyer,* in connection with any failure or neglect on the part of the said *buyer* to pay such indebtedness, etc."

Was the creditors' extension agreement such as contemplated at the time of the execution of the guarantee by defendant? The contract must be given effect according to its own expressed intention as gathered from all the words and clauses used, taken as a whole, due regard being had also to the surrounding circumstances. 12 R. C. L., Sec. 25, page 1074. The liability of the surety cannot be enlarged beyond the strict intent of the instrument. 12 R. C. L., Sec. 25, page 1075, Warner Gear Co. v. Bergdoll, 253 Pa. 164, 97 A. 1085.

What did the parties intend by the words "extension of time by note or otherwise?" It clearly means indulgence in connection with the negligence or failure on the part of the buyer, the National Speedway Refining Company, in paying the bill upon the date of maturity. "By note or otherwise" can mean nothing else than a paper given by a buyer to a seller, by one merchant to another, in payment of an obligation, whether it be by promissory note, check, draft, or any other paper used in the commercial world in payment of obligations.

In the instant case plaintiff was one of eleven creditors to join in a *binding* written agreement of extension between creditors, National Speedway Refining Company, and trustees, under which the creditors not only agreed not to enforce their claims for the definite period of six months, but also *gave to the trustees* the powers: to fill vacancies on the board of directors; to manage, supervise and reorganize the conduct of the business; to liquidate the assets of the company; and to grant the debtor company further extensions. In other words, it took the control of the business entirely out of the hand of the principal debtor.

As stated in Stearns "The Law of Suretyship", 3rd Ed., p. 109, sec. 78: "If the contractual relation

of principal and creditor are changed by the substitution of new parties in place of those originally contracting, either by the original party assigning his interest in the contract to another in whole or in part, or by associating new parties by partnership agreements, the surety or guarantor will be discharged."

An analogous case is found in Marshall-Wells Company, Respondent, v. H. O. Tenney et al., 118 Oregon 373, 244 Pacific 84 (1926). That was an action based on a letter of credit which provided: "In consideration of the sum of one dollar ($1) to me in hand paid, receipt whereof is hereby acknowledged and the further extension of credit granted by Marshall-Wells Hardware Company to Multnomah Iron Works, I hereby unconditionally guarantee payment of whatever amount said Multnomah Iron Works shall at any time be owing to the said Marshall-Wells Hardware Company on account of goods hereafter delivered whether said indebtedness is in the form of notes, bills or open account. This shall be an open and continuing guaranty and shall continue in force notwithstanding *any* change in the form of such indebtedness, or renewals, or *extensions* granted by you without obtaining *any* consent thereto."

The above was signed on September 4, 1917 by Tenney, Prael, and Beall, directors of the Multnomah Iron Works at that time. In 1920 Beall sold his interest in the company and resigned. On January 1, 1921, some $14,800 was still due for merchandise.

On February 7, 1921, Multnomah Iron Works was unable to meet its obligations in the ordinary course of business. It then entered into an extension agreement with its largest creditors which provided: for the continuance of the business under the supervision of a committee of creditors, unless in their discretion they believed it to the best advantage of creditors to liquidate it; *for extension of the time of payment of*

*the creditors' respective claims; for such further extensions as the committee deemed advisable.*

Subsequently, the business of the Multnomah Iron Works was liquidated, and the plaintiff sued the sureties. In discussing the interpretation of the surety contract and the meaning of "extensions", the court said: "It is well settled that, after the intention of the parties or the scope of the guarantor's undertakings has been determined by the ordinary rules of construction either from the instrument itself in which it is clearly expressed, or from the instrument and the surrounding circumstances, the rule of *strictissimi juris* applies, that is, that the guarantor is entitled to have his undertaking as thus determined strictly construed and that it cannot be extended by construction or implication beyond the precise terms of his contract and he has the right to insist upon the strict performance of any terms or conditions which have been stipulated; and it is incumbent upon one who claims the benefit of a guaranty to show that its terms have been strictly complied with." ...... (p. 384) "Referring particularly to the word 'extensions,' stipulated in the document, we believe that by giving the language used a fair, liberal and reasonable interpretation, as it was intended by the parties at the time the guaranty was given, *the extensions contemplated and stipulated were the ordinary and usual extensions for time of payment, such as usually given in the transactions of business.* Such an extension of time was consented to by the guarantor at the time he signed the letter of credit. *The ordinary extension of time is a mutual arrangement, and is usually intended to give the debtor a chance to obtain money to pay the debt.* It does not necessarily follow that a radical change in the method and business of the principal debtor and the turning over of the entire business of the principal debtor to the new parties and at the same time

agreeing to refrain from enforcing payment, all in such a manner that the guarantor would not be in a position to protect himself by taking proper measures to be subrogated to the rights of the creditor, would come within the purview of such a consent.'' (Italics supplied).

In the instant case, the extension agreement, in addition to precluding the creditors from enforcing their obligations, had the effect, by placing the above powers in the hands of the trustees, of actually changing the parties to the original undertaking to which the defendant was a surety. It also operated as an assignment of rights which the suretyship contract never contemplated.

When the plaintiff entered into the creditors extension agreement and ignored the interests of the defendant guarantor, it in effect elected to look to the trustees for the payment of the claim, and not to the defendant. While the guarantee of the defendant provided that the Pure Oil Company might grant extension to the debtor, it did not provide that The Pure Oil Company might transfer its right to grant extensions to a board of trustees, so that the claim of plaintiff could never mature or become due, except in the discretion of the trustees.

In our opinion, a reasonable construction of defendant's obligation requires the conclusion that by his suretyship contract defendant meant to consent only to an extension in the nature of an indulgence; that he did not consent to the type of extension granted in the instant case. When plaintiff joined in the creditors' extension agreement, it not only prevented the surety from paying the debt and pursuing the debtor for indemnity for at least six months, but it also transferred to trustees the right to never mature the principal debt; it changed the entire financial structure of the

principal debtor. It so impaired the surety's right of subrogation as to discharge him.

In the instant case at the same time that defendant signed the suretyship contract, Handler and Wenograd signed suretyship contracts exactly similar to that signed by defendant. Before signing the extension agreement plaintiff secured written waivers from Handler and Wenograd, so that Handler and Wenograd would not be discharged by that extension agreement. Plaintiff did not request or obtain any such waiver from defendant. The lower court, in the majority opinion, referring to this feature says: "This circumstance strongly indicates the intention of the plaintiff not to release the guarantors when the extension agreement was made." We can not agree with this conclusion. In our opinion it rather indicates the construction by plaintiff of the contract of guarantee that the sureties would be released by the execution of the creditor's extension agreement, unless the sureties consented thereto. As stated in Tustin v. Phila. R. C. & I. Co., 250 Pa. 425, 95 A. 595, "When the terms of a contract are doubtful or capable of two different interpretations, the meaning put on the instrument by the parties themselves may be shown and will be enforced by the courts. Their interpretation of the instrument is strong evidence of being the correct one, and is expressive of the intention of the parties when they executed the contract." To same effect, Hempfield Township School District v. Cavalier, 309 Pa. 460, 164 A. 602.

The assignment of error is sustained, the judgment reversed, and judgment now entered for the defendant.