**UNITED STATES of America,**
Plaintiff,

v.

**AMERICAN EMPLOYERS INSURANCE COMPANY, Defendant and Third-Party Plaintiff.**

**I. S. Rickman, individually and trading as Sylvania Manufacturing Company**

and

**Sylvania Manufacturing Company, Inc., Third-Party Defendants.**

**Civ. A. 14668.**

United States District Court
E. D. Pennsylvania.
May 23, 1956.

W. Wilson White, U. S. Atty., Arthur R. Littleton, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Swartz, Campbell & Henry, Philadelphia, Pa., for defendant and third-party plaintiff.

Gray, Anderson & Schaffer, Philadelphia, Pa., for third-party defendants.

CLARY, District Judge.

This is a suit by the United States of America against American Employers Insurance Company (hereinafter called "Employers") on a Performance Bond given by Employers guaranteeing the performance by Bo-Jack Manufacturing Corporation (hereinafter called "Bo-Jack") of Contract No. W30–280–qm–6911 (O.I. 3593), dated 28 February, 1948, for the manufacture and delivery of 200,000 Poplin Khaki Shirts for the United States Army. The contract called for a delivery schedule beginning in the month of June, 1948 of 14,534 shirts in number, and each succeeding month for six months of 30,911 shirts. As a result of the failure of Bo-Jack to meet the delivery schedule, and under the circumstances hereinafter set forth, the Government terminated the contract and brought this action against Employers, as surety, under the Delays-Liquidated Damages Clause of the contract. The defendant, as third-party plaintiff, joined the subcontractor as third-party defendant. The case was tried to the Court without a jury. From the pleadings, the evidence and the exhibits, the Court makes the following.

### Findings of Fact

1. The parties to this suit are the United States of America, plaintiff; American Employers Insurance Company, a Massachusetts Corporation, defendant and third-party plaintiff; Isaiah S. Rickman, individually and trading as Sylvania Manufacturing Company, and Sylvania Manufacturing Company, Inc. (hereinafter called "Sylvania"), third-party defendants.

2. At all times between January 24, 1948 and April 29, 1948, Isaiah S. Rickman was sole proprietor of a manufacturing company, trading as Sylvania Manufacturing Company, with textile plants at Montgomery, Pennsylvania, and Williamsport, Pennsylvania.

3. On April 29, 1948 all of the assets of the unincorporated business were assigned to Sylvania Manufacturing Company, Inc. and said corporation assumed all the liabilities of Isaiah S. Rickman, individually and trading as Sylvania Manufacturing Company.

4. On or about January 24, 1948, after a series of preliminary conferences between David Rose, president of Bo-Jack, and Isaiah S. Rickman, Bo-Jack and Sylvania entered into a written

agreement wherein Sylvania undertook to manufacture and deliver 200,000 Poplin Khaki Army shirts, in the event that Bo-Jack was successful in its bid to the Quartermaster Corps of the Army for the supplying of said shirts to the Army under Bid No. QM–30–280–48–397, Bid opening 28, January, 1948. By the terms of this agreement (Exhibit D–17), should Bo-Jack be awarded the contract, Sylvania agreed to meet Army specifications, the required delivery schedule, and also agreed to pay to Bo-Jack liquidated damages due the Government for delay in delivery caused by it. In addition, Sylvania was to supply all thread, buttons, shipping supplies, labor and all other miscellaneous items needed relative to the manufacture and completion of the shirts. Bo-Jack was to supervise and guide the starting of the contract. Thereafter the contract was amended verbally to provide that Bo-Jack was to order and secure for Sylvania the thread, buttons and shipping supplies; Sylvania, however, to pay for them.

5. On February 28, 1948 the War Department awarded Contract No. W30–280–qm–6911 to Bo-Jack providing for the manufacture of 200,000 Poplin Khaki Shirts with the delivery schedule as set out in the introduction to this opinion.

6. As a condition of said contract Bo-Jack on March 10, 1948 provided a Performance Bond in the amount of $29,960.-00 with itself, as principal, and Employers, as surety. The Performance Bond (Construction or Supply), a U. S. Standard Form No. 25 (Revised), provided that should the principal fail to comply with the requirements of the contract in all respects, the surety would be bound to the United States in damages. The Bond specifically provided for waiver of notice to the surety of all duly authorized modifications of said contract.

7. Prior to the execution of the contract the Government inspected the facilities of Sylvania, approved said facilities and awarded the contract to Bo-Jack with the express understanding that the execution of the contract was to be through Sylvania's facilities and that delivery of the piece goods out of which the shirts were to be manufactured would be made directly to Sylvania's plant.

8. Immediately after Bo-Jack was awarded the Government contract, it placed orders for the needed findings, threads, buttons, etc. as well as shipping supplies with suppliers with whom it had previously done business. David Rose, Bo-Jack's president, assured Isaiah S. Rickman, then sole owner of Sylvania, that these items would be delivered promptly and in due course for the performance of the contract.

9. The Government delivered within a reasonable time the piece goods to Sylvania at its Montgomery plant and the necessary patterns directly to Bo-Jack.

10. Despite the timely action of the Government with respect to the patterns, David Rose failed and neglected to promptly turn the same over to Sylvania. It required extraordinary effort on the part of Sylvania, through Rickman, to obtain possession of the patterns. They were finally secured by Rickman by waiting until early morning in front of Rose's house for Rose's return, the transfer occurring in the early hours of the morning after many hours wait by Rickman. In addition, Rose for Bo-Jack never fulfilled its obligation to Sylvania to "supervise and guide the start of the production of the shirts". Bo-Jack had experience with Government procurement contracts; Sylvania had none; and it was vitally important at the start that Bo-Jack impart its special skilled knowledge to Sylvania in order to enable Sylvania to obtain the mass production needed to meet delivery schedules.

11. In addition to the difficulties occasioned by the facts related in the foregoing Finding of Fact, there was undue and unwarranted delay in the delivery of thread, buttons and findings, as well as shipping containers. The Court finds as a fact that this delay was in no wise oc-

casioned by Sylvania but was the entire fault of Bo-Jack. The suppliers with whom Bo-Jack placed the orders would not deliver the supplies because of Bo-Jack's financial irresponsibility and it was not until Rickman guaranteed the payment of the accounts directly to the suppliers that the orders were accepted and shipped. The entire fault for the failure of any deliveries in the month of June is attributable directly to the failure of Bo-Jack to supply shipping containers until the last day of June, 1948, which made any June delivery by Sylvania impossible.

12. The first delivery under the contract by Sylvania was on July 1, 1948 when 6,750 shirts were shipped. Thereafter there were shipments on July 15—3,450; July 21—3,150; July 28—450; July 29—6,750, or a total of 20,550 shirts.

13. On July 9, 1948 the United States wrote Bo-Jack warning it that because of failure to make proper and prompt delivery, unless substantial improvements were made, it might become necessary to terminate the contract for default, and called attention to its obligation to pay the Government under the Delays-Liquidated Damages Clause one-fifth of 1% of the price of each unit for each day's delay after the delivery date. It further demanded an explanation of the delinquency and information as to what steps were being taken to overcome it.

14. Bo-Jack never replied to that communication, but on July 15, 1948 Sylvania wrote the following letter:

"Phone 9989  Sylvania Mfg. Co.
Makers of
Blouses-Sportswear-Novelties
47 West Third Street
Williamsport, Pa.  Our new address
15 July 1948  328 W. Fourth Street

"Lt. Col, C. T. McEniry  QMC
"Procurement Division
"Department of the Army  Re: QMPON–P–C–HED
"111 E. 16th Street  QM 6911–0I–3593
"New York, N. Y.  Shirts, Poplin, Khaki-1,
Stand-Up Collar

"Gentlemen:

"We are in receipt today of a copy of your letter of 9 July directed to the Bo-Jack Manufacturing Co., Plymouth, Penna., the primary contractors, and we are the sub-contractor.

"We shipped today 3,450 units and will be able to ship an additional 3,450 units, which is lot size, on Monday, the 19th, and should be able to complete all of the June schedule on or about the 21st of this month and on that date start shipping on the July schedule.

"The reason for our present delinquency is due to a series of reasons, as follows:

"We were late in getting started due to the fact that we did not receive our supplies, such as thread, buttons, shipping cartons and transfers.

"This being our first experience with an Army shirt, in the training of our girls we were striving for quality rather than quantity at the risk of being delinquent on the early part of our contract. We ordinarily operate on a piece rate method and we put all of our employees on an hourly basis so that they would have no reason or incentive to rush their work.

"Our plant was closed down beginning at noon, Friday, July 2nd for our annual vacation holiday and we started operations again on Monday of this week.

"We feel very confident that we will catch up on our delinquent quantities in August, and if nothing unforeseen happens, we should be able to run ahead of schedule from that time on. We are running approximately 80 machines, employing about 135 people total, and they are all engaged in the making of shirts on this contract. At the present writing we have attained a production of approximately 1,200 units per day, and we are planning to work overtime, and if necessary transfer some employees from our Williamsport plant together with the necessary equipment to insure the delivery of the contract. Should there be anything further you would like to know, we would be very happy to comply.

"Very truly yours,
"Sylvania Manufacturing Co.
"/s/ I. S. Rickman
"I. S. Rickman

"ISR:ES
"cc: Bo-Jack Mfg. Co.
Plymouth, Pa.
"cc: Mr. W. Leamy, Insp."

15. From the inception of the contract the relations between Bo-Jack and Sylvania deteriorated. Rickman became rather suspicious of Bo-Jack's actions and demanded that the contract be assigned to Sylvania. Under date of June 22, 1948 Bo-Jack, in writing, agreed to make such an assignment. The proposed agreement was that after assignment of the contract the payments by the Government would be made directly to Sylvania and that of the contract price of $.749, the sum of $.705 was to be retained by Sylvania and the remaining $.044 per unit was to be paid to Bo-Jack by Sylvania immediately as payments were received from the finance office. This agreement never became effective because of the impossibility under existing law of assigning a Government Procurement Contract. However, taking advantage of the provision of law permitting the assignment of claims (monies) due under the contract rather than the contract itself, Assignment of Claims Act of 1940, Public Law No. 811, 76th Congress, 31 U.S.C.A. § 203, the parties entered into an Agreement dated 15 July 1948 with the Williamsport National Bank of Williamsport,. Pennsylvania, wherein the bank was to receive all of the monies due under the contract and apportion them between the parties in the ratio set forth in the proposed agreement of June 22, 1948. This agreement was entered into coincidental with the letter addressed by Sylvania to the Army, referred to in the foregoing Finding of Fact.

16. From July 15, 1948 until early October, 1948, no further disagreements or difficulties between Bo-Jack and Sylvania, which might interfere with production by Sylvania, appear in the testimony.

17. While Sylvania made periodic shipments, it totally failed to meet production schedule. As of September 30, 1948 of the 107,267 shirts due under the contract 38,676 were undelivered.

18. On October 6, 1948 the Government terminated, by letter, the right of Bo-Jack to deliver the said 38,676 shirts, but said nothing in its letter about termination of the liability of Bo-Jack to deliver 30,911 shirts each in the succeeding three months of October, November and December.

19. The chronology of events leading to the ultimate termination of the contract is as follows: On October 1, 1948 the Army Inspector in Charge reported to his superior that delinquency in delivery was due to the late start caused by the prime contractor being late in supplying the subcontractor with necessary findings and that there appeared to him to be a conflict between Rickman, sub-

contractor, and David Rose, prime contractor; further that he had been notified by the subcontractor that he, Rickman, intended to discontinue all operations when he had finished all shirts which had been cut. The basis for the above statement was that he would not continue without an understanding with David Rose (Bo-Jack), prime contractor. The letter of October 6, 1948, referred to in the above Finding of Fact, followed. On October 8, 1948 Sylvania wrote the Quartermaster Corps that he had stopped working on the Poplin Khaki Shirts under the contract on which it had been working as subcontractor for Bo-Jack, alleging that Bo-Jack had violated its contract, and requested immediate withdrawal of Government property from the plant on the ground that it would be occupied within a week or ten days by new tenants. On 15 October 1948 the Contracting Officer for the Army wrote Bo-Jack demanding that it take steps to complete its contract. The inspection report for the week of October 15, 1948 revealed only 14 completed shirts on hand. On October 29, 1948 Bo-Jack answered the letter of October 15th requesting permission to complete the contract in one of its other plants or at a regular contract plant, but did nothing further in the matter. On 30 November 1948 the Contracting Officer terminated the right to deliver the further balance due under the contract. This letter contained "findings of fact" in accordance with the contract provision and no appeal was taken therefrom. On December 1, 1948 the defendant Employers was notified of the termination. On 25 July 1949 claim was made against Bo-Jack under the Delays-Liquidated Damages Clause and on 18 August 1949 claim was made against the Employers for damages under the contract because of the default of Bo-Jack. Upon refusal of Bo-Jack and Employers to pay, suit was instituted on January 5, 1953.

20. As a result of the demand of Sylvania that the Government remove its cloth from its plant, the Quartermaster Corps made provisions to and promptly removed the government-owned cloth from the Montgomery plant of Sylvania to the Quartermaster Depot in Philadelphia within a few days after the demand was received.

21. The Government advertised for bids for that part of the contract terminated on October 6, 1948, and on December 10, 1948 relet this portion of the contract to Southland Mfg. Co. of North Carolina; deliveries to be completed by the end of February, 1949.

22. The Government also advertised for bids on the completion of the remaining shirts, 83,776 in number, terminated November 30, 1948, and on December 29, 1948 relet the manufacturing of these shirts to Raycord, Inc. of North Carolina; deliveries to be completed by the end of March, 1949.

23. There being no contravening evidence, the Court finds that the Government acted with reasonable promptitude in the reletting of these contracts.

24. Failure to complete the contract was due to the combined fault of Bo-Jack and Sylvania.

25. The Government performed all duties required under the contract and in nowise interferred with the completion of the contract by Bo-Jack, prime contractor.

26. The Delays-Liquidated Damages Clause of the contract provided a reasonable method of calculating damages and the Court finds that the rate of one-fifth of 1% of the unit price per day for delay in delivery constitutes liquidated damages, and not a penalty.

27. Bo-Jack, prime contractor, defaulted in the delivery of 122,452 shirts, later supplied by Southland and Raycord.

28. The following chart sets forth in detail the quantities, periods of delay, number of days, unit price, and the calculated liquidated damages to the Govern-

ment, together with credits due Bo-Jack as a result of savings and liquidated damages collected from Southland and Raycord.

| Mfg. Co. | Quantity | Period of delay | | No. of days | Unit Price | Liquidated damages 1/5 of 1% of the price of each unit for each day's delay |
| | | From date due | To date of delivery | | | |
| --- | --- | --- | --- | --- | --- | --- |
| S | 18,564 | 9–30–48 | 1–31–49 | 123 | $0.749 | $ 3,420.49 |
| R | 11,330 | " | 2–10–49 | 133 | " | 2,257.32 |
| R | 5,170 | 10–31–48 | " | 102 | " | 789.96 |
| S | 15 | " | 2–16–49 | 108 | " | 2.43 |
| R | 4,500 | " | 2–22–49 | 114 | " | 768.47 |
| S&R | 21,226 | " | 2–28–49 | 120 | " | 3,815.58 |
| S&R | 17,871 | 11–30–48 | " | 90 | " | 2,409.37 |
| R | 500 | " | 3–14–49 | 104 | " | 77.90 |
| R | 9,600 | " | 3–18–49 | 108 | " | 1,553.13 |
| R | 2,940 | " | 3–25–49 | 115 | " | 506.47 |
| R | 6,960 | 12–31–48 | " | 84 | " | 875.79 |
| R | 23,776 | " | 3–31–49 | 90 | " | 3,205.48 |
| | 122,452 | | | | | $19,682.39 |

To this total, the following credits are to be applied:

(a) Withheld on DO Voucher No. 105840, Nov. 1949 ........................ $1,981.27

(b) Liquidated damages collected from Raycord and Southland ................... 1,003.49

(c) Saving to Government from Raycord & Southland contracts ................. 1,395.00

$4,379.76

29. The plaintiff, United States of America, is entitled to judgment against defendant, Employers, in the sum of $15,302.63, with interest from April 1, 1949.

30. Bo-Jack breached its contract with Sylvania by its failure to promptly deliver patterns, findings and shipping supplies. More importantly, it also failed to supervise and guide Sylvania in the training of personnel to acquire the necessary skills to attain mass production on a Government contract. By its letter of July 15, 1948, referred to in Finding of Fact No. 14, Sylvania, insofar as its relationship with Bo-Jack was concerned and despite the breach, agreed to continue production of the shirts and Bo-Jack was justified in relying upon its agreement. The waiver of the breach by Sylvania, however, extended only to its undertaking to proceed with the production of the shirts and did not constitute a waiver of claims it might have against Bo-Jack. The record will not support any finding that Bo-Jack interfered with production of the shirts after July 15, 1948, the date on which Rickman certified in writing that Sylvania was capable of mass production. The refusal of Sylvania to proceed after October 6, 1954 is not justified on the record and the action of the Government in terminating the right of Bo-Jack to furnish the undelivered shirts was proper under the circumstances.

31. The Court finds that the initial delay in delivery was occasioned

solely by the actions of Bo-Jack, and the continuing difficulties by Sylvania in its efforts to meet production schedules stemmed directly from that situation. The Court is unable on the record made in this case to determine with any degree of accuracy a percentage of fault or a formula which would be fair and equitable in the apportionment of damages between the two parties at fault. Since both were at fault, damages will be divided between the wrongdoers. The Court finds that Employers, as subrogee of Bo-Jack, is entitled to recover one-half of the damages from Sylvania.

## Discussion

The defendant surety, Employers, disclaims liability, first on the ground that there was a material alteration of the contract, to wit: substitution of Sylvania for Bo-Jack, without its knowledge or consent, by assignment of the contract from Bo-Jack to Sylvania; second, that the contract does not provide for liquidated damages on termination of the contract; third, that even if the contract provided for liquidated damages in the event of termination, the Government was required to act with reasonable promptness and it did not prove it had done so; and finally, that the Government had waived liquidated damages by its failure in its notice of termination of November 30, 1948 to specifically state that it would claim liquidated damages.

■ As to the first defense, little need be said. Bo-Jack, the principal, entered into a contract with the Government with the distinct understanding, both on the part of the Government and of the principal, who was the prime contractor, that the work would be performed by Sylvania. There might be some merit to the claim that the surety would be discharged, if the assignment of the contract itself to Sylvania had occurred; Sterns, Law of Suretyship, Fourth Edition, Pages 110–111; Pure Oil Co. v. Shlifer, 115 Pa.Super. 319, 175 A. 895. The facts of this case, however, do not lend themselves to the application of that principle. Whether or not the surety had any knowledge of the agreement of January 24, 1948 between Bo-Jack and Sylvania, prior to entering its bond, does not appear in the record. The undertaking of the bonding company is absolute and the Government in no way waived any of its rights under the bond. The actions of the Contracting Officer in this case show clearly that the item to be manufactured and delivered was in short supply and that time was of the essence in the completion of the contract. The contract was performed (to the extent that it was actually performed) exactly as contemplated between the parties. Therefore, there is no merit to this contention.

■ As to the second defense with respect to the Delays-Liquidated Damages Clause that the contract does not provide for liquidated damages on termination, the Clause inter alia reads as follows:

"Provided, however, That the Government reserves the right to terminate the right of the Contractor to proceed with deliveries or such part or parts thereof as to which there has been delay, and to purchase similar material or supplies in the open market or secure the manufacture and delivery thereof by contract or otherwise, charging against the Contractor and his sureties any excess cost occasioned the Government thereby, together with liquidated damages accruing until such time as the Government may reasonably procure similar material or supplies elsewhere."

It can hardly be gainsaid in view of the definite and precise language quoted above that the Government did reserve its right not only to recover excess cost but liquidated damages as well. That the Clause worked both to the advantage and disadvantage of the contractor is evidenced by the credits given by the Government to the contractor. The Government fortunately was able to secure similar goods at a lower cost. That lower cost reduced the obligation of the contractor. In addition the Government collected liquidated damages from the two

subsequent contractors. Credit for that likewise was given to the contractor in reduction of its liability. The Government in its application of charges and credits has fully carried out the terms of the agreement and is entitled to recover liquidated damages on termination of the contract under the express provisions of the contract.

■ The third defense seeks to impose a burden upon the Government to establish by direct evidence that it had acted with reasonable promptness in reletting the contracts. Defendant surety in its brief now argues for the first time that the Government was under no obligation to readvertise the bids and should have relet them without bidding and charging the additional costs to the contractor, and since it did not do so the surety and the principal should be relieved. Defendant surety misapprehended its burden. The burden of proving that damages should have been mitigated is on the party asserting it; Finberg Trading Co. v. Republic of China, 5 Cir., 1955, 220 F.2d 844. If the defendant surety had any confidence in this asserted defense, proper practice would have indicated that it avail itself of the discovery procedures available to it to establish such a defense. None having been established, or even attempted to be established, the Court can only conclude that the Government acted promptly and in the utmost good faith, particularly since by its advertising and reletting it obtained a lower price and the reduction in price inured to the benefit of the contractor and its surety.

■ The final defense asserted by the surety that the Government by failing to claim liquidated damages in its notice of termination on November 30, 1948, waived liquidated damages. In support thereof it cites the case of United States, for Use of Gillioz v. John Kerns Cont.. Co., 8 Cir., 1944, 140 F.2d 792, 152 A. L.R. 1340. The principle of law enunciated in that case is of no comfort to the surety. In that case Government engineers changed and delayed work called for by prime contract which in turn necessitated changed and delayed work under subcontract requiring performance by a specified time. The Court there held that the subcontractor was not liable to general contractor for liquidated damages for delay. The facts of that case differ completely from those here present. In this case not only did the Government do nothing to interfere or delay the work but on the contrary did all in its power to facilitate the completion of the contract. This defense likewise is without merit.

■ Defendant surety also asserts that the Government must bear some fault for the delay in not affording Bo-Jack an opportunity to complete the contract at one of its own plants or at another contract plant. A complete answer to that is that Bo-Jack never took any steps between October 15th and November 30th to arrange such a procedure. Bo-Jack was in default and there was no obligation on the part of the Government to continue to make inquiry of Bo-Jack as to what its intentions were. Bo-Jack had an obligation to deliver 30,911 shirts on October 31st and a further obligation to deliver 30,911 shirts on November 30th. Not one shirt was forthcoming. It was undoubtedly clear to the Government from Bo-Jack's failure to request delivery of cloth to one of its alleged plants that it was taking no steps to complete the contract. That the Government waited a reasonable length of time to give the prime contractor that opportunity was an act of generosity on the part of the Government, which the defendant now attempts to stigmatize as a breach of duty. I do not so consider it but rather view it in the light of attempted co-operation on the part of the Government with the prime contractor to minimize damages.

■ The defense of the third party defendants to this action simply stated is that Bo-Jack defaulted in its contract at the outset, placed the delivery schedule from the beginning in jeopardy and created a condition making performance of the contract impossible. Ergo, Sylvania should not be held liable in damages to

any extent. This contention might have some merit, if on July 15, 1948, and at a time when Sylvania could with reasonable basis have asserted the defense it now attempts to interpose, it had cancelled its contract with Bo-Jack. No such action was taken. On the contrary, by its letter of July 15th it undertook not only to meet the production schedule per month but to cut down the deficiencies in delivery. There appears in the record no just cause for Sylvania to discontinue operations on October 6th. While Bo-Jack is definitely at fault, so is Sylvania, and since it is impossible to quantitatively apportion them, the damages will be divided.

▆▆▆▆▆ The final matter to be discussed is that of interest. We are dealing here with one contract and only one for 200,000 shirts. Final delivery was due under the relet contract on March 31, 1949. It was only on that date that damages could possibly be computed. The debt was due and owing the Government on that date. On that date under the written contract it became the duty of the defendant to pay it. One who is entitled to recover damages for breach of contract has a legal right to recover interest at the legal rate from the time payment is withheld after it has become the duty of the debtor to make such payment. The right to recover legal interest arises when the damages are ascertainable by computation. The fact that a bona fide dispute exists as to the amount of the indebtedness does not destroy the plaintiff's right to full interest on the amount found to be due; Palmgreen v. Palmer's Garage, Inc., 1955, 383 Pa. 105, 117 A.2d 721. Interest, therefore, will be allowed from the first day of April, 1949.

### Conclusions of Law

1. This Court has jurisdiction of the subject matter and parties to this suit.

2. A valid contract was entered into between Bo-Jack and the United States for the manufacture and delivery of 200,-000 Poplin Khaki Shirts from raw material furnished by the Government and included therein was a valid Delays-Liquidated Damages Clause which set forth a reasonable method to be used in computing liquidated damages in case of default or delay.

3. Defendant, Employers, executed a valid and binding Performance Bond by which it agreed to pay the Government for any damages suffered from the failure of Bo-Jack to complete the contract and in which Employers waived all notice as to any authorized changes or modifications to the original contract between Bo-Jack and the United States. There was incorporated in the Performance Bond the contract between Bo-Jack and the United States and all the undertakings, covenants, terms, conditions and agreements of said contract.

4. The said contract by Article 11 permitted the assignment of monies due Bo-Jack; therefore, the assignment of monies to the Williamsport National Bank on July 15, 1948 did not constitute a variance in the contract or a substitution of parties.

5. The termination by the United States of Bo-Jack's right to deliver 38,-676 shirts on September 30, 1948 was in strict accord with the provisions of the contract, with the terms of the Delays-Liquidated Damages Clause, and was valid and binding upon the parties.

6. The termination by the United States of Bo-Jack's right to deliver 83,-951 shirts on November 30, 1948 was in strict accord with the provisions of the contract, with the terms of the Delays-Liquidated Damages Clause, and was valid and binding upon the parties.

7. Under the Delays-Liquidated Damages Clause of the contract the United States is entitled to one-fifth of 1% of the unit price of each shirt for each day's delay in delivery, and the defendant surety is liable to the United States upon its Performance Bond in the sum of $15,-302.63, together with interest from April 1, 1949, and proper costs.

8. Defendant surety as third-party plaintiff is entitled to recover over against defendant I. S. Rickman, indi-

vidually and trading as Sylvania Manufacturing Company and Sylvania Manufacturing Company, Inc., third-party defendants, one-half of the damages assessed against it in the preceding paragraph.

Accordingly, an appropriate order for judgment may be submitted.