

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-26-2001

# Garden State Tanning v. Mitchell Mfg Grp Inc

Precedential or Non-Precedential:

Docket 00-2432

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Garden State Tanning v. Mitchell Mfg Grp Inc" (2001). *2001 Decisions.* Paper 274.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/274

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 23, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2432

GARDEN STATE TANNING, INC.

v.

MITCHELL MANUFACTURING GROUP, INC.; MITCHELL
CORPORATION OF OWOSSO; THE LAMONT GROUP,
INC.; MITCHELL MANUFACTURING GROUP, a LAMONT
GROUP COMPANY, formerly known as LAMONT GROUP
ACQUISITION CORP.
          Mitchell Automotive, Inc.
          f/k/a Mitchell
          Manufacturing Group, Inc.
          and Mitchell Corporation of
          Owosso, Appellants.

APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 98-cv-04789 )
Trial Judge: Magistrate Judge Jacob P. Hart

Argued September 24, 2001

Before: ROTH, WEIS and GARTH, Circuit Judges

(Filed: November 23, 2001)

Erik G. Chappell, Esquire
  (ARGUED)
Daniel J. Dugan, Esquire
McHugh, DeNune & McCarthy
5580 Monroe Street
Sylvania, Ohio 43560

Attorneys for Appellants

Walter H. Flamm, Jr.,
 Esquire (ARGUED)
Robert E. Walton, Esquire
Brian W. Waering, Esquire
J. Bryan Tuk, Esquire
Flamm, Boroff & Bacine, P.C.
Union Meeting Corporate Center
925 Harvest Drive, Suite 220
Blue Bell, Pennsylvania 19422

Attorneys for Appellee

OPINION OF THE COURT

WEIS, Circuit Judge.

In this diversity case arising under Pennsylvania law, defendant Mitchell Corporation of Owosso ("Owosso") appeals from a judgment on a jury verdict based on a guaranty for payment of goods furnished to its subsidiary. Owosso argues that the guaranty was abrogated when the subsidiary was sold to another corporation. We will affirm.

Owosso has been involved in the production of interior automotive trim for many years. In 1996, the company created a subsidiary called "Mitchell Manufacturing Group, Inc.," whose function was to process leather for use by auto manufacturers. Owosso's goal was ultimately to sell this subsidiary.

Since its inception, the subsidiary had obtained leather from plaintiff Garden State Tanning, Inc. By 1997, Mitchell Manufacturing's account had become so delinquent that Garden State demanded Owosso's guaranty for payment of

2

its subsidiary's invoices. Owosso complied and, in a letter to Garden State dated September 8, 1997, stated:

> "We, Mitchell Corporation of Owosso, the parent company of Mitchell Manufacturing Group, Inc., do promise to pay in full all monies owed to you for goods received in the event Mitchell Manufacturing Group, Inc. do not pay.
>
> This letter is renewable in one year if needed."

Soon thereafter, Owosso began discussing with the Lamont Group the possibility of its purchasing Mitchell Manufacturing.

On March 3, 1998, Helen Malik, Secretary and Treasurer of both Owosso and Mitchell Manufacturing, wrote to Garden State that Owosso was "in the process of closing on the sale of Mitchell Manufacturing Group, Inc. to a minority group. . . . We are requesting that we be removed from COD payment requirements as of February 27, 1998." The letter then recited the precise language of the September 8, 1997 guaranty.

Garden State responded in a letter dated March 6, 1998, that "with the continuing guarantee of [Mitchell Manufacturing parent] Owosso," the COD payment arrangements would be removed. The letter continued,

> "There are several things on which we'll need to agree as we put the change in place. When the sale of [Mitchell Manufacturing] occurs I'll need to update our credit files and will be sending you the necessary paperwork. We'll need to know whether the guarantee of [Owosso] will be affected by the sale and, if so, to what extent? If the guarantee stays fully in place we will not, at this time, set formalized credit limits for [Mitchell Manufacturing]. However, since [Mitchell Manufacturing] is already on `net prox 30' terms, we reserve the right to set such limits should [Mitchell Manufacturing's] account status fall more than thirty (30) days past due and contact [Owosso] directly for payment. We will get in touch with you personally, or anyone else whom you designate, before either of these takes place.

        Please let me know if this is acceptable."

Although that letter was addressed to Ms. Malik, William F. Mitchell, the president of Owosso, wrote "OK W.F. Mitchell" at the bottom of the document. A copy of the letter with this notation was then faxed to Garden State.

On April 22, 1998, Owosso sold substantially all of Mitchell Manufacturing's assets, along with the Mitchell Manufacturing name, to the Lamont Group. Lamont then changed its name to "Mitchell Manufacturing Group, a Lamont Group Company." The Owosso subsidiary was renamed "Mitchell Automotive, Inc."

Garden State asserted that it was not advised of the exact date of the sale and so continued to ship goods to the same company -- "Mitchell Manufacturing"-- at the same address as it had previously. By April 22, 1998, Mitchell Manufacturing had incurred more than $2,780,000 in unpaid invoices for Garden State leather. After Owosso sold its subsidiary, Garden State sent an additional $1,370,000 in goods, all on credit, to Mitchell-Lamont.

The record does not indicate when Garden State learned of the Mitchell Manufacturing sale. On June 3, 1998, however, its credit manager wrote Ms. Malik requesting a corrected version of the guaranty. Specifically, he stated:

> "it would be helpful if you adjusted the [Owosso] guarantee to reflect the presence of the Lamont Group and the change in the relationship between Mitchell Manufacturing Group, Inc. and [Owosso] (no longer the "parent company"?)."

The following day, Ms. Malik responded that Mitchell Manufacturing had been sold to the Lamont Group on April 22, 1998 and that Owosso was no longer the parent company. She also represented that Lamont had assumed the "liability of the payables of Mitchell Manufacturing Group, Inc." when it purchased the company.

Owosso denied liability for any of the Mitchell debt, and the dispute proceeded to litigation. Based on the"OK W. F. Mitchell" notation on Garden State's March 6, 1998 letter, along with other factors, including the text of the parties' correspondence and deposition testimony, the District

4

Court found the existence and extent of the guaranty agreement ambiguous. Accordingly, the matter was submitted to a jury presided over by a Magistrate Judge pursuant to 28 U.S.C. S 636.

The jury returned a special verdict finding Owosso liable for $2,783,391.10, the total cost of goods Garden State had shipped to Mitchell Manufacturing before April 22, 1998. The jurors also held Owosso responsible for $1,365,619.82 for the leather supplied to Mitchell-Lamont. The Magistrate Judge then added prejudgment interest, bringing the total judgment against Owosso to $4,636,515.59.[1]

Owosso's appeal raises a number of objections, none of which amounts to reversible error.

Owosso contends that the Court erroneously failed to require the jury to consider the doctrine of strictissimi juris in interpreting the guaranty contract. We conclude that the principle has no application here.

The difference between the interpretation and construction of contracts is discussed in Ram Construction Co., Inc. v. American States Insurance Co., 749 F.2d 1049 (3d Cir. 1984). When an ambiguity exists in the agreement, the problem is one of interpretation. If, however, the terms are clear, construction of the contract determines its legal operation. 749 F.2d at 1052-53.

The paramount goal of contract interpretation is to determine the intent of the parties. Meeting House Lane, Ltd. v. Melso, 628 A.2d 854, 857 (Pa. Super. 1993) (guaranty contracts subject to same rules of interpretation as other agreements). There is no special standard of interpretation for contracts creating secondary obligations. Restatement (Third) of Suretyship & Guaranty S14 cmt. c (1996). Therefore, to the extent that there was uncertainty about the terms of the guaranty agreement, the issue was properly submitted to the jury.

Owosso's argument supporting the application of

---

1. Judgments have also been entered against Mitchell Automotive, Inc. and Mitchell-Lamont. Owosso is presently in bankruptcy and has obtained leave to pursue this appeal.

5

strictissimi juris relies on a passage from the case of Pure Oil Co. v. Shlifer, 175 A. 895 (Pa. Super. 1934). In that action on a suretyship contract, the Pennsylvania Superior Court quoted the trial court:

> "It is well settled that, after the intention of the parties or the scope of the guarantor's undertaking has been determined by the ordinary rules of construction [interpretation] either from the instrument itself or from the instrument and the surrounding circumstances, the rule of strictissimi juris applies, that is, that the guarantor is entitled to have his undertaking as thus determined strictly construed, and that it cannot be extended by construction or implication beyond the precise terms of his contract . . . ."

175 A. 895, 898.

Although this rule of construction in suretyship is accurate with regard to gratuitous guaranties assumed by individuals, the Pennsylvania Supreme Court has long held that the principle of strictissimi juris does not apply to "corporate compensated sureties." Fiumara v. Am. Sur. Co. of New York, 31 A.2d 283, 287 (Pa. 1943); City of Philadelphia v. Nat'l Sur. Co., 173 A. 181, 182 (Pa. 1934) ("[T]he rule of strict construction applied to individuals as sureties does not apply to paid sureties."). Cf. Meyer v. Indus. Valley Bank & Trust Co., 239 A.2d 371, 373 (Pa. 1968) (material alteration in surety agreement made without consent of gratuitous surety operates as complete discharge of surety's obligation).

The rationale underlying this distinction is easily understood: corporate suretyship, "an undertaking for money consideration by a company chartered for the conduct of such business, . . . is essentially an insurance against risk." Brown v. Title Guar. & Sur. Co., 81 A. 410, 410-11 (Pa. 1911). These guarantors "may call themselves `surety companies,' [but] their business is in all essential particulars that of insurance. Their contracts are usually in the terms prescribed by themselves, and should be construed most strictly in favor of the obligee." Id. at 411; see also Fiumara, 31 A.2d at 288 (in Pennsylvania,

6

corporate compensated surety is considered practical
equivalent of insurance company).

The distinction drawn between compensated and
gratuitous suretyship is significant, particularly because
the Pennsylvania Supreme Court has not yet had occasion
to rule on the application of strictissimi juris  to a guaranty
similar to that now before us.

Moreover, the Superior Court appears increasingly
reluctant to apply that principle to guaranty agreements
entered into for profit. Compare, e.g. , Robert Mallery Lumber
Corp. v. B. & F. Assocs., Inc., 440 A.2d 579, 582 (Pa. Super.
1982) (language of guaranty contract was not ambiguous,
but if it were, it would be strictly construed against the
guarantor-bank), with Continental Bank v. Axler , 510 A.2d
726, 729 (Pa. Super. 1986) ("A compensated  surety is
discharged only if, without the surety's consent, there has
been a material modification in the creditor-debtor
relationship and said modification has substantially
increased the surety's risk.") (emphasis added), and Meeting
House Lane, 628 A.2d at 857.

The Pennsylvania Superior Court is not alone in its
reluctance to apply the strictissimi juris principle. The
United States Supreme Court stated nearly a century ago
that the doctrine is "a stringent one, and . . . . one which
ought not to be extended to contracts not within the reason
of the rule, particularly when the bond is underwritten by
a corporation which has undertaken for a profit to insure
the obligee." United States ex rel. Hill v. Am. Sur. Co. of New
York, 200 U.S. 197, 202 (1906).

The Restatement articulates the modern antipathy
toward the doctrine: "Older cases applied very strict rules
. . . . As time passed, courts became unsatisfied with a rigid
application of this doctrine" and began to retreat from it,
particularly in cases involving more sophisticated corporate
guarantors. Restatement (Third) Suretyship & Guaranty
S 37 cmt. a.

The courts' disillusionment with strictissimi juris is not
difficult to understand. The doctrine protected secondary
obligors who entered into guaranty agreements for reasons
involving familial or neighborly affection and who did not

7

profit financially from the transaction. But the rule was problematic when applied to those secondary obligors who were in the business of underwriting debt for monetary benefit.

Rigid application of the doctrine allowed secondary obligors to avoid substantial secondary obligations solely on the basis of minor, immaterial changes in the relationship between the principal obligor and obligee. The consequential windfalls inuring to those secondary obligors often exceeded any harm caused by the obligee's acts. Id.

Owosso asserts that it was a gratuitous guarantor and, therefore, the jury was required to strictly construe the agreement. Nothing in the circumstances, however, suggests that the guaranty here was motivated by selfless generosity. On the contrary, the record indicates that Owosso was negotiating for the sale of Mitchell Manufacturing as early as autumn of 1997. Certainly, it was in Owosso's best financial interest to maintain or increase the subsidiary's value by keeping it in operating condition. It can hardly be said that the guaranty, without which Mitchell Manufacturing would have lost its raw material supply, was wholly munificent in nature.

We are confident that the Pennsylvania Supreme Court would reject Owosso's claim to gratuitous guarantor status and would instead follow the modern trend away from the doctrine of strictissimi juris. See, e.g., Northern Ins. Co. v. Aardvark Assocs., 942 F.2d 189, 193 (3d Cir. 1991) ("Although we are not bound in a diversity case to follow decisions of a state intermediate appellate court, we are instructed that such decisions are not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.") (internal quotations omitted).

Even if this guaranty were held to be gratuitous, Owosso's claim to strict construction would fail. The Pennsylvania Supreme Court has indicated that it will not discharge gratuitous guarantors on the basis of modifications in the creditor-debtor relationship where the guarantor's consent to these changes has been obtained. See Meyer, 239 A.2d at 373. Here there is no question of

8

consent to changes in the agreement, because the guarantor itself was the driving force in bringing about the revision. It was Owosso that sold the assets of Garden State's debtor; the former parent company cannot now claim surprise or ignorance of the resulting effect on its interests.

Owosso has misinterpreted the rule of strictissimi juris to apply to interpretation as well as to construction of the agreement. As noted above, we predict that Pennsylvania would not apply that doctrine in this case and in any event the question for the jury was one of interpretation. Owosso's contention that the guaranty applied only to invoices pending at the time it was issued is unconvincing. The jury had ample reason to interpret the letters of September 8, 1997 and March 3, 1998 as effective continuing guarantees of Mitchell Manufacturing's obligations to Garden State. Particularly in light of the September 8, 1997 letter, which stated that the guaranty would be renewable in one year if needed, it is doubtful that the jury could have concluded otherwise.

The findings on the Mitchell-Lamont invoices rest on somewhat different grounds. Essentially, the claim for debts accrued after the sale to the Lamont Group is based on the "OK" of Owosso's President Mitchell, affixed to Garden State's letter of March 6, 1998. The jury was entitled to consider this notation as evidence that Owosso would adhere to its guaranty after the sale, at least until it notified Garden State otherwise.

At first glance, it would appear unusual for Owosso to maintain the guaranty after the sale to Lamont. Garden State, however, did not know the details of the transfer, and the company to which it continued to ship its goods after the sale bore the same name and mailing address. Garden State could reasonably have surmised that Owosso sold less than all of Mitchell Manufacturing's assets, or perhaps exchanged stock, or that under the terms of the arrangement, it was important to Owosso that Lamont continue to receive leather supplies. The jury might also have considered it highly significant that Owosso never communicated its intent to revoke the guaranty until contacted by Garden State in June 1998.

9

In addition, we note that the jurors might well have been impressed with the fact that Garden State, relying on Owosso's guaranty, shipped substantial amounts of leather to Mitchell-Lamont, a course of action it likely would not have followed in the absence of the guaranty.

Owosso also complains that the District Court erred in refusing to admit evidence that Garden State ignored pre-set credit limits although the unpaid invoices of Mitchell Manufacturing and Mitchell-Lamont were rapidly burgeoning. Although Garden State had set an internal credit limit of $1 million on Mitchell Manufacturing, this information was never conveyed to Owosso. Accordingly, there was no basis on which the guarantor could invoke that limit. The ruling excluding that evidence is not reversible.

Owosso also argues that the imposition of prejudgment interest was in error. We find no merit to that issue, nor to Owosso's remaining contentions, which, we find, do not warrant discussion.

Accordingly, the judgment of the District Court will be affirmed.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

10