# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 24, 2006　　　　　　　Decided June 23, 2006

No. 05-1230

NATIONAL TREASURY EMPLOYEES UNION,
PETITIONER

v.

FEDERAL LABOR RELATIONS AUTHORITY,
RESPONDENT

---

On Petition for Review of an Order of the
Federal Labor Relations Authority

---

*Julie M. Wilson* argued the cause for petitioner. With her on the briefs were *Gregory O'Duden* and *Barbara A. Atkin*.

*William E. Persina*, Attorney, Federal Labor Relations Authority, argued the cause for respondent. With him on the brief was *William R. Tobey*, Acting Solicitor.

Before: GINSBURG, *Chief Judge*, and SENTELLE and HENDERSON, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: The National Treasury Employees Union petitions for review of a decision of the Federal Labor

Relations Authority holding the Internal Revenue Service did not have a duty to bargain over the Union's proposed "Leave Swapping Program." Because the Authority reasonably concluded that the subject of how leave would be allocated among employees was "covered by" the pre-existing collective bargaining agreement between the Union and the IRS, we deny the Union's petition for review.

## I. Background

The Union and the IRS are parties to a national collective bargaining agreement that governs the terms and conditions of employment at, among other locations, the Service's call site in Denver, Colorado. Article 32, Section 1.C of that agreement provides:

> [T]he Employer will resolve a conflict in requests by employees in the same occupation for scheduled annual leave by granting preference to the employee with the most service as determined by enter on duty (EOD) date.

*U.S. Dep't of the Treasury, Internal Revenue Serv., Denver, Colo.*, 60 F.L.R.A. 572 app. at 574 (2005) (*IRS*). The managers at the Denver site scheduled local employees' annual leave in accord with their seniority, per Article 32, and with the scheduling requirements set centrally by the business operating division of the IRS, which requirements dictated the number of employees needed to answer calls on any given day.

Employees who believed their requests for leave had been unfairly denied complained about this arrangement. Ms. Patience Ellis, the senior official at the Denver call center, created a committee of union and management representatives to consider the issue. The committee developed a consensus

"Leave Swapping Program" under which one employee could transfer his approved leave to another employee with the same job skills, regardless of either employee's seniority. *Id.* at 575.

Representatives of the Union took the position that the leave-swapping program was a binding collective bargaining agreement, but management refused either to implement or to bargain further over it on the ground that the subject was already covered by Article 32 of the national agreement. This prompted the Union to file a grievance claiming the IRS had violated the Federal Service Labor-Management Relations Statute, 5 U.S.C. §§ 7116(a)(1), (5), by "refus[ing] to consult or negotiate in good faith." When the Union and the IRS were at an impasse over the grievance, the Union demanded arbitration.

The arbitrator concluded the national agreement "does not cover the leave swapping program"; rather, it "only governs how the agency will initially assign annual leave" and does "not speak to the situation in which an employee chooses not to use approved leave." Unlike the national agreement, the arbitrator explained, the leave-swapping program involves only "voluntary swaps among willing employees"; seniority "is not a consideration" because "there is no conflict [when] both employees want to make the swap." It followed that, because the leave-swapping proposal was not "covered by" the national agreement, the agency had violated 5 U.S.C. §§ 7116(a)(1) and (5) by refusing to bargain over it.

The IRS appealed to the Authority, which held "the Arbitrator erred in determining [the leave swapping program] 'covers an entirely different subject'" than does the national agreement. *IRS*, 60 F.L.R.A. at 574. In the Authority's view, the proposed leave-swapping program "would circumvent" the system of seniority established by the national agreement because it would "permit[] an employee with approved annual

leave ... to grant [that] annual leave to any employee, whether or not there is a more senior employee who has requested leave for that same period." *Id.* Accordingly, the Authority concluded, the national agreement having "expressly addressed" the standard for determining who gets leave when not all requests can be granted, "the Union's leave swapping proposal is covered by the agreement and the Agency has no duty to bargain" over it. *Id.*

The Union filed a motion for reconsideration, arguing the Authority had failed to defer to the arbitrator's interpretation of the national agreement, as required by precedent. The Authority denied the motion, explaining that "although the Authority defers to an arbitrator's factual findings and contract interpretations, the Authority does not defer to an arbitrator's conclusions as to the legal effect of those findings and interpretations." *U.S. Dep't of the Treasury, Internal Revenue Serv., Denver, Colo.*, 60 F.L.R.A. 893, 894 (2005). In this case, the Authority explained, it had disagreed only with the arbitrator's application of the "covered by" doctrine, *id.*, which application it reviews *de novo*, *see, e.g., Nat'l Treasury Employees Union Chapter 168*, 55 F.L.R.A. 237, 241-42 (1999). The Union petitions for review of both the Authority's orders denying relief.

## II. Analysis

We will not set aside an order of the Authority unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see id.* § 7123(c) (adopting standard in § 706); *Nat'l Treasury Employees Union v. FLRA*, 414 F.3d 50, 57 (D.C. Cir. 2005). The Union argues the Authority acted arbitrarily because it failed to defer to the arbitrator's interpretation of the national agreement, even though in the past the Authority has "consistently declined to overturn

arbitral interpretations of collective bargaining agreements." As evidence of this alleged failure to defer, the Union notes the Authority (1) twice described its own decision as "contrary to the Arbitrator's conclusion," *IRS*, 60 F.L.R.A. at 574, and (2) ignored Ms. Ellis's testimony that the national agreement did not "address" whether employees were required to consider seniority if they wanted to trade leave. In sum, the Union argues the Authority's decision cannot stand because it is "fabricated out of whole cloth," with "nothing in the record evidence" to support it.

The Authority argues the "Union misapprehends the issue in this case": The Authority rejected "the arbitrator's legal conclusion as to the interrelationship between the proposal and [the national agreement], not his interpretation of the agreement." The Authority maintains it (1) owes no deference to the arbitrator's application of the "covered by" doctrine, which it accordingly reviewed *de novo*, and (2) reasonably concluded a proposal that would allow an employee to transfer his leave to another, notwithstanding the request of a third employee with greater seniority than that of the transferee, would "effectively nullify the operation of [Article 32, Section 1.C]" of the national agreement.

As we recently explained in another case brought by the same Union, an agency's "duty to bargain [over disputes arising] mid-term derives from the ... command [of the Statute] to both labor and management to 'meet and negotiate in good faith.'" *Nat'l Treasury Employees Union v. FLRA*, 399 F.3d 334, 337 (2005). Such bargaining is not required, however, with respect to a matter "covered by" a collective bargaining agreement already in place. *Id.*

The Authority uses a two-step analysis to determine whether a proposal for mid-term bargaining is "covered by" an

existing collective bargaining agreement. First the Authority considers whether the subject matter "is expressly addressed by the terms of the parties' collective bargaining agreement." *Nat'l Treasury Employees Union*, 59 F.L.R.A. 217, 218 (2003). The Authority does not require an "exact congruence" between the matter proposed for bargaining and the text of the existing agreement; "if a reasonable reader would conclude that the provision [in the agreement] settles the matter in dispute," then the matter is "covered." *U.S. Dep't of Health & Human Servs., Soc. Sec. Admin., Balt., Md.*, 47 F.L.R.A. 1004, 1017-18 (1993). Second, if the Authority determines the matter is not expressly addressed in the agreement, then it must decide whether the matter is "inseparably bound up with ... a subject expressly covered by the contract." *Id.* at 1018. In this case the Authority concluded, pursuant to the first step of the analysis, that the "standards for granting leave are expressly addressed" in, and are therefore "covered by," the national agreement. *IRS*, 60 F.L.R.A. at 574.

We are not persuaded by the Union's arguments that the Authority erred in so holding. To begin, we agree with the Authority that the Union has mistaken the arbitrator's application of the "covered by" doctrine for an "interpretation" of the national agreement. Application of the "covered by" doctrine is an exercise in construction; it requires the adjudicator of a dispute over the meaning of a collective bargaining agreement to determine how broadly or narrowly the agreement should be read in view of the policies embodied in the statute establishing the duty to bargain. *See Dep't of the Navy, Marine Corps Logistics Base, Albany, Ga. v. FLRA*, 962 F.2d 48, 58-59 (D.C. Cir. 1992) ("covered by" doctrine should be applied to further the "stability and repose" the Statute is intended to promote). In short, whether a subject is "covered by" an existing agreement is a question of law. *See Garden State Tanning, Inc. v. Mitchell Mfg. Group, Inc.*, 273 F.3d 332, 335

7

(3d Cir. 2001) ("construction" "determines [the] legal operation" of agreement; "interpretation" of agreement resolves any ambiguity in terms used).

The "covered by" analysis is thus analogous to the inquiry we make in order to determine whether a federal statute impliedly preempts related state law; rather than focusing only upon the meaning of a particular word or words in search of congressional intent, as we might in a case of statutory interpretation, *see, e.g.*, *Friends of the Earth, Inc. v. EPA*, 446 F.3d 140, 142 (D.C. Cir. 2006) (word "daily" as used in the Clean Water Act "means daily, nothing else"), "the entire scheme of the statute must ... be considered .... If the purpose of the [federal] act cannot otherwise be accomplished[,] ... the state law must yield." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (internal quotation marks removed); *see also Sheridan Kalorama Historical Ass'n v. Christopher*, 49 F.3d 750, 757-58 (D.C. Cir. 1995) (considering "comprehensive scheme[s]" provided by federal statute and D.C. law and holding federal law controlled).  Therefore, although the Authority defers to an arbitrator's interpretation of a contract, it properly reviews *de novo* the arbitrator's application of the "covered by" doctrine. *See Nat'l Treasury Employees Union Chapter 168*, 55 F.L.R.A. at 241-42; *cf. Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (reviewing *de novo* decision of district court regarding preemption).

Although the Union here argues the Authority did not defer to the arbitrator's interpretation of the national agreement, the Union has not pointed to any word or phrase in that agreement to which the Authority attributed a different meaning than had the arbitrator.  The Authority disagreed with the arbitrator only with regard to what the national agreement "speak[s] to," "governs," and "address[es]" -- in other words, what the agreement, or more specifically Article 32 of the agreement,

"covers." Because the Authority properly decides *de novo* what the agreement covers, it did not err in failing to defer to the arbitrator in this regard; nor for the same reason was it required, as the Union implies, to rely upon Ms. Ellis's testimony regarding what she believed the national agreement addressed.

Therefore the Authority's decision cannot fairly be described, the Union's assertion notwithstanding, as having been "fabricated out of whole cloth" and without "record evidence" to support it. The Authority reasoned that the Union's leave-swapping proposal would depart from the criterion of seniority to which the parties had subscribed in the national agreement. *IRS*, 60 F.L.R.A. at 574. Under the Union's proposal an employee with leave approved on the basis of his seniority could trade that leave to an employee other than the next most senior employee who had requested, but was denied, leave for that same period. Consistent with its past decisions, therefore, the Authority concluded the leave-swapping program was "covered by" the national agreement, which had established seniority as the sole criterion upon which employees would qualify for leave when not all who wanted leave for a particular period could be accommodated. *See Prof'l Airways Sys. Specialists*, 56 F.L.R.A. 798, 804 (2000) (proposal to train employees who could not sustain a certain level of pay due to lack of training was "covered by" provision of agreement setting forth agency's obligations to provide training and to compensate employees unable to sustain that level of pay). That conclusion, if not compelled, was eminently reasonable.

## III.  Conclusion

The Authority neither failed to defer to the arbitrator's interpretation of the national agreement nor otherwise erred in concluding the national agreement "covered" the subject of how

leave would be allocated.  The Union's petition for review is, therefore,

*Denied.*