# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 20, 2011          Decided July 8, 2011

No. 10-1089

FEDERAL BUREAU OF PRISONS,
PETITIONER

v.

FEDERAL LABOR RELATIONS AUTHORITY,
RESPONDENT

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES,
COUNCIL OF PRISON LOCALS, COUNCIL 33,
INTERVENOR

On Petition for Review of a Final Decision
of the Federal Labor Relations Authority

*Howard S. Scher*, Attorney, U.S. Department of Justice, argued the cause for petitioner. With him on the briefs was *William G. Kanter*, Attorney.

*Joyce G. Friedman*, Attorney, Federal Labor Relations Authority, argued the cause for respondent. With her on the brief was *Rosa M. Koppel*, Solicitor. *William R. Tobey*, Deputy Solicitor, entered an appearance.

*David A. Borer* and *Judith Galat* were on the brief for intervenor American Federation of Government Employees, Council of Prison Locals, Council 33 in support of respondent. *Mark D. Roth* entered an appearance.

Before: GINSBURG and BROWN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

GINSBURG, *Circuit Judge*: The Federal Bureau of Prisons petitions for review of a decision of the Federal Labor Relations Authority holding the Bureau had a duty to bargain over its implementation of a "mission critical" standard for staffing federal correctional institutions. Because the Authority unreasonably concluded the mission critical standard is not "covered by" the collective bargaining agreement between the Bureau and its employees' union, we grant the petition and vacate the Authority's decision.

## I. Background

The terms and conditions of employment for federal correctional officers are prescribed in a nationwide collective bargaining agreement (the Master Agreement), executed in 1998 by the Bureau and the American Federation of Government Employees, Council of Prison Locals No. 33 (the Union). Article 18 of the Master Agreement, entitled "Hours of Work," establishes procedures for the scheduling and assignment of work for officers at each of the Bureau's facilities. Section (d) of Article 18 provides work assignments are to be determined on a quarterly basis through a bidding system. Seven weeks before the end of the quarter, each correctional institution must publish a roster listing the positions that will be available to officers in the next quarter. The officers bid for posts and shifts, and assignments are

made according to seniority. The list of assignments is then sent to the warden of the institution for approval.

Article 18(g) provides for the assignment of "relief" officers to serve for the quarter, covering for officers who are on sick or annual leave. A relief officer might be assigned to several different posts over the course of the quarter, although "reasonable efforts will be made to keep sick and annual relief officers assigned within [the same] shift." All officers must cycle through the relief assignment before any officer is required to serve in that role again.

When senior managers at the Bureau learned late in 2004 the agency would not be receiving all the funding they had expected for 2005, they took steps to reduce overtime expenses, which in their view had become excessive. Wardens were relying upon regular staff to work overtime (at a higher wage) to cover absences that might have been filled by a relief officer paid his regular wage. In order to avoid this waste of newly scarce funds, the Bureau needed wardens to assign more officers to relief duty each quarter and correspondingly reduce the number of officers assigned in advance to other posts.

To explain the need for this change, the Bureau's Assistant Director, John Vanyur, issued a memorandum stating the quarterly roster for each institution should include only those posts deemed "critical" to the mission of that institution. Although under the Master Agreement the warden retained the right of final approval, Vanyur cautioned that under the "mission critical" standard certain posts — such as "Medical Escort," "Front Gate Officer," and "Chapel Officer — should not "typically" or "ordinarily" be deemed

"critical."[*] The work associated with these non-critical posts would be assigned instead as a "task" to be performed by officers serving as relief, and only as needed.

One week after Vanyur sent this memorandum, the Union demanded the Bureau negotiate over how the mission critical standard would be implemented. The Bureau refused to bargain because, in its view, it had already bargained with the Union over the procedures for assigning work and the result of that bargaining, Article 18, "covered" and therefore preempted any further duty to bargain. *See Dep't of Navy v. FLRA*, 962 F.2d 48, 53 (D.C. Cir. 1992). The Union then filed a formal grievance claiming the Bureau's refusal to bargain was an unfair labor practice, in violation of the Federal Service Labor-Management Relations Statute, 5 U.S.C. §§ 7101-7154; *see* § 7116(a)(1), (5) (the Statute). When the Bureau denied the grievance, the Union invoked arbitration.

The arbitrator concluded the mission critical standard was not covered by Article 18 because that provision "deals with procedures only" and not with the content of the rosters. In his view, Article 18(d), which prescribes the bidding system, could not possibly cover "a nationwide change in staffing patterns that affected ... virtually every bargaining-unit employee." He characterized the Bureau's argument otherwise as "specious" and in bad faith. Then, after concluding the "impact" of mission critical staffing upon employees was both "reasonably foreseeable" and "greater

---

[*] The memorandum was addressed to the Bureau's regional directors rather than to its wardens. Vanyur testified in arbitration, however, that he had sent a subsequent letter explaining that the wardens, not the regional directors, still had final approval over their rosters. The letter is not in the record but neither the Union nor the Authority casts doubt upon Vanyur's testimony.

than de minimis," the arbitrator ordered the Bureau to "enter forthwith into good faith ... negotiations with the Union."

The Bureau filed an exception to this award with the Authority, which held the arbitrator had correctly stated the law and correctly ruled for the Union. *U.S. Dep't of Justice, Fed. Bureau of Prisons v. Council of Prison Locals, Council 33*, 64 F.L.R.A. 559, 560–62 (2010). That "Article 18 and the critical roster program both deal with rosters," the Authority said, is not enough to show the Article "covers" that program. *Id.* at 561. Rather, it agreed with the arbitrator's understanding that Article 18 merely "lays out the procedures for filling specific positions," and does not "address[] the impact ... of eliminating certain positions." *Id.* The Bureau had a duty to bargain with the Union over the implementation of the mission critical standard, the Authority said, because the rosters issued pursuant to that standard were not "the type of rosters addressed in Article 18." *Id.* Deeming the arbitrator's findings "reasonable and supported by the record," *id.*, the Authority denied the Bureau's exception, *id.* at 562.

The Authority also identified a "separate and independent" ground for affirming the award: To wit, the arbitrator had based his decision not only upon the Statute but also upon Article 3(d) of the Master Agreement, which the Authority said imposed upon the Bureau "an independent bargaining obligation." *Id.* Because the Bureau had objected solely to the arbitrator's statutory ruling, the award could stand upon the contractual basis alone, the Authority held, even if the Bureau was correct that under the Statute the mission critical staffing standard was "covered by" Article 18. *Id.*

6

## II. Analysis

The Bureau petitions for review of the Authority's decision, which "[w]e will not set aside ... unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Nat'l Treasury Emps. Union v. FLRA*, 452 F.3d 793, 796 (D.C. Cir. 2006) (hereinafter *NTEU*) (quoting 5 U.S.C. § 706(2)(A)); *see* 5 U.S.C. § 7123(c). The Bureau argues the Authority misapplied the law when it held the Bureau's instructions on staffing were not "covered by" the Master Agreement. *See NTEU*, 452 F.3d at 796–98.

If a collective bargaining agreement "covers" a particular subject, then the parties to that agreement "are absolved of any further duty to bargain about that matter during the term of the agreement." *Dep't of Navy*, 962 F.2d at 53.[*] For a subject to be deemed covered, there need not be an "exact congruence" between the matter in dispute and a provision of the agreement, so long as the agreement expressly or implicitly indicates the parties reached a negotiated agreement on the subject. *NTEU*, 452 F.3d at 796 (internal quotation marks omitted).

An agreement between an agency and its employees' designated representative must be construed "in view of the policies embodied in the [Statute]." *Id.* at 797. When the question is whether an agreement "covers" a matter, we must answer bearing in mind the importance of finality to collective bargaining. *See Dep't of Navy*, 962 F.2d at 59 (the "covered by" doctrine ensures the parties' "stability and repose" during the term of their agreement). We will

---

[*] The initial term of the Master Agreement was 1998 to 2001, but the Agreement provided it would be renewed automatically for one-year periods until the parties negotiated a replacement.

therefore reject any construction of a collective bargaining agreement that treats it as but "a starting point for constant negotiation over every agency action." *Id.* (internal quotation marks omitted).

The Bureau argues Article 18 covers and preempts all disputes about particular rosters issued pursuant to and in compliance with the procedures in Article 18(d). The Authority responds that a "narrow procedural provision" such as Article 18(d) cannot reflect bargaining over a "broader subject" such as, here, the "reorganization of posts." Stated differently, both parties understand Article 18 to be a procedural provision; what they disagree about is the scope of the agreement it reflects.

We believe the Bureau's position is the correct one: The procedures prescribed in Article 18 cover the substance of all decisions reached by following those procedures. Section 7106(a) gives an agency an exclusive, non-negotiable right to assign work but, under § 7106(b), it may bargain with the representative of its employees over the "procedures" it will use when it exercises that authority and the "appropriate arrangements" it will make for any employee "adversely affected" by a particular action. An agreement prescribing such "arrangements" and "procedures," that is, the "impact and implementation" of an agency's management right, therefore covers the content of the agency's decisions made under that rubric. *See Dep't of Navy*, 962 F.2d at 50 ("Although an agency is not required to bargain with respect to its management rights *per se*, it is required to bargain about the impact and implementation of those rights"). Article 18, specifically in sections (d) and (g), reflects the parties' earlier bargaining over the impact and implementation of the Bureau's statutory right to assign work. *See* § 7106(b) (permitting bargaining over the "numbers, types, ... or

positions assigned to any ... work project[] or tour of duty"). Specifically, these provisions represent the agreement of the parties about the procedures by which a warden formulates a roster, assigns officers to posts, and designates officers for the relief shift.

The Authority, however, held the Bureau had a mandatory duty to engage anew in impact and implementation bargaining over the mission critical standard on the ground that a roster implementing that standard is not the "type of roster[]" covered by Article 18. 64 F.L.R.A. at 561. In support of that reading, the Authority said only that the mission critical initiative "addresses the impact of a nationwide change in staffing patterns," and does not "deal[] with procedures." *Id.*[*] The Authority has never explained why a roster drafted and issued in accordance with the procedures prescribed by Article 18 is not an Article 18 roster, nor has it responded to the Bureau's unquestionably correct observation that Article 18 itself is the product of impact and implementation bargaining under § 7106(b).

Perhaps the best evidence Article 18 covers the mission critical standard comes from the testimony of Philip Glover, the Union's lead negotiator of the Master Agreement, who described the purpose of that provision. Before the Master Agreement was executed in 1998, Glover said, "there wasn't a clear roster procedure" at federal prisons. At the prison where he had worked, for example, "six lieutenants [would] get into a room and divvy up the staff similar to a softball team being picked," and there was no "set procedure" for challenging an assignment once made. In negotiation of the

---

[*] It is incoherent, in any event, to suggest the  mission critical standard "addresse[d] the impact of a nationwide change in staffing patterns" when the premise of the Union's complaint is that the "nationwide change" is the mission critical standard itself.

Master Agreement, the Union secured from the Bureau a "complete rewrite" of Article 18 to place procedural checks upon the Bureau's authority to assign work, including the advance publication of available posts, the solicitation of bids, and a limited right to appeal an assignment. Article 18, as Glover's testimony confirms, is a compromise — "[not] exactly what [the Union] devised, but ... what we ended up with in negotiations." Because the parties reached an agreement about how and when management would exercise its right to assign work, the implementation of those procedures, and the resulting impact, do not give rise to a further duty to bargain. Article 18 therefore covers and preempts challenges to all specific outcomes of the assignment process.

The Authority erred insofar as it held negotiated procedures such as those in Article 18 cannot cover decisions about substance. In fact that is exactly what § 7106 of the Statute contemplates. *See Dep't of Navy*, 962 F.2d at 50; *see, e.g.*, *id.* at 61–62 (agreement permitting Marine Corps to set performance criteria barred challenge to specific criteria; agreement establishing procedures for seconding employees to other facilities barred challenge to specific transfers); *see also NTEU*, 452 F.3d at 796–98 (agreement detailing how IRS employees accrue leave covered Union's proposed "leave-swapping" program). Here, as in *Department of the Navy*, the Authority mistakenly imposed upon the employing agency a duty to negotiate over the impact and implementation of a procedure that is itself the outcome of impact and implementation bargaining. *See* 962 F.2d. at 61-62. Because that approach makes a collectively bargained agreement no more than a "starting point for constant negotiation" rather than a guarantor of "stability and repose," *id.* at 59, we must reject it.

The arbitrator caught the scent of just this problem while in pursuit of an appropriate remedy. Although, when considering the merits, he had found the mission critical standard had catalyzed a "nationwide change in staffing patterns," he realized that imposing "pre-mission critical" standards — the very status quo ante remedy the Union had requested — "would accomplish nothing": The Bureau would retain "its Article 18(d) prerogatives" and "[l]ocal wardens would simply repost the kind of mission critical rosters they [had] been posting" since receiving the Vanyur memorandum because it was within their discretion under Article 18(d) to do so. Instead of restoring the status quo ante, the arbitrator directed the Bureau to engage in impact and implementation negotiation with the Union over "Mission Critical Posts."

The circularity of the arbitrator's reasoning about the remedy reflected the flaw underlying the rest of the award, as the Bureau argued to the Authority. With respect to the merits, the arbitrator had found the Vanyur memorandum effected a significant change in the procedures for developing rosters under Article 18(d). With respect to the remedy, however, the arbitrator concluded the mission critical standard did not change anything of substance because it did not ultimately alter the warden's ability to control the assignment of work.

As the Authority, if not the arbitrator, should have seen, the Union's grievance is at bottom a complaint about the discretion Article 18 itself affords to the wardens. According to witnesses on both sides, Article 18 was negotiated in a period of better funding and more liberal hiring. Wardens had been exercising their approval authority favorably to the officers, by staffing more full-time posts than were needed and then paying overtime wages to meet the need for relief

officers. Deteriorating economic conditions made these practices unsustainable, but that change does not justify disregarding an agreement made when times were better.

Ignoring this inconvenient history (as had the arbitrator), the Authority simply deferred to the findings in the award and concluded the Master Agreement did not cover the mission critical standard. 64 F.L.R.A. at 561. Neither in its decision nor in its brief on appeal has the Authority addressed Glover's testimony about the origins of Article 18. It has also ignored the arbitrator's belated realization that Article 18, even without the mission critical standard, permitted wardens to adopt the very rosters about which the Union had grieved. The Authority abused its discretion by approving an award so patently at odds with itself.

Both the arbitrator's difficulty with the question of remedy and the Authority's silence on the subject likely stem from a glaring ambiguity in the record about the legal force of the Vanyur memorandum. The record before the Authority included the arbitrator's second-hand quotation of the Vanyur memorandum, but not the memorandum itself; it included testimony about Vanyur's subsequent letter clarifying the memorandum, but not the letter itself. Nor had any party provided an account of how the mission critical standard was implemented. The record reflected at most an effort by the Bureau's management to persuade or perhaps even to pressure wardens to adopt a particular approach for managing their budgets, not a binding policy. Because the Authority made no attempt to determine the force, if any, of the Vanyur memorandum, or to consider the intended scope of Article 18, its conclusion the Master Agreement does not cover the standard described in that document is all the more difficult to credit.

We also reject the Authority's contention Article 3(d) of the Master Agreement provides a "separate and independent" basis for the arbitral award. As the Authority reads it, Article 3(d) requires the Bureau to negotiate over any "national policy issuance" that affects the officers' conditions of employment. Although we doubt a contractual provision covering a management decision would not also cover a policy issuance to the same effect, we need not decide the matter here; because the arbitral award makes no distinction between the purportedly "separate" statutory and contractual grounds for the award, the Bureau correctly maintains it was not required to file a separate exception.

## III. Conclusion

The Authority endorsed an incoherent arbitral award and embraced an unreasonably narrow view of what the Master Agreement "covers." Because its decision is thus "incompatible with ... the terms [and] the purpose" of the Statute, "we are obliged to intervene." *Dep't of Navy*, 962 F.2d at 53. Accordingly, we grant the petition for review, vacate the decision of the Authority, and remand this matter for the Authority to set aside the arbitral award.

*So ordered.*