# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 22, 2017        November 17, 2017

No. 16-1301

UNITED STATES DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF PRISONS FEDERAL CORRECTIONAL COMPLEX COLEMAN, FLORIDA,
PETITIONER

v.

FEDERAL LABOR RELATIONS AUTHORITY,
RESPONDENT

On Petition for Review of a Final Decision
of the Federal Labor Relations Authority

*Tyce R. Walters*, Attorney, U.S. Department of Justice, argued the cause for petitioner. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General at the time the brief was filed, and *Thomas H. Byron*, *III*, Attorney.

*Fred B. Jacob*, Solicitor, Federal Labor Relations Authority, argued the cause for respondent. With him on the brief were *Zachary R. Henige*, Deputy Solicitor, and *Stephanie J. Fouse*, Attorney.

Before: GRIFFITH and PILLARD, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: This case involves the "covered-by" doctrine, which embraces a well-established principle in labor law: If a union and an employer in a collective-bargaining relationship reach an agreement on a subject during contract negotiations, neither side has a duty to bargain any further over that subject once the parties execute a collective bargaining agreement. *See, e.g.*, *Fed. Bureau of Prisons v. FLRA* (*BOP I*), 654 F.3d 91, 94 (D.C. Cir. 2011); *Enloe Med. Ctr. v. NLRB*, 433 F.3d 834, 838–39 (D.C. Cir. 2005). "For a subject to be deemed covered, there need not be an 'exact congruence' between the matter in dispute and a provision of the agreement, so long as the agreement expressly or implicitly indicates the parties reached a negotiated agreement on the subject." *BOP I*, 654 F.3d at 94–95 (citation omitted). It does not matter whether a subject was specifically discussed or contemplated during the negotiations leading to the parties' agreement. *Dep't of the Navy v. FLRA*, 962 F.2d 48, 58–59 (D.C. Cir. 1992). What matters is whether a subject is within the compass of the provisions in the parties' agreement. *BOP I*, 654 F.3d at 94–95. The covered-by doctrine is analytically distinct from waiver. A waiver occurs when a party knowingly and voluntarily relinquishes its right to bargain over a subject; when a disputed subject is covered by the parties' agreement, however, the parties have exercised their rights to bargain over that subject. *Enloe Med. Ctr.*, 433 F.3d at 837–39.

The issue in this case is whether the provisions in the Master Agreement between the Federal Bureau of Prisons, Federal Correctional Complex, Coleman, Florida ("Agency") and the American Federation of Government Employees

("Union") cover a matter with respect to which the parties had a dispute after the Master Agreement was signed. After the parties' collective bargaining contract took effect, the Agency notified the Union that it intended to consolidate the relief rosters at the four institutions in the prison complex and assign employees from one institution to relieve employees at the other institutions. The parties bargained intermittently over the matter until the Agency finally ended bargaining. Local 506 of the Union filed a charge with the Federal Labor Relations Authority ("FLRA" or "Authority") claiming that the Agency had committed an unfair labor practice, in violation of §§ 7116(a)(1) and (5) of the Federal Service Labor-Management Relations Statute ("Statute"), 5 U.S.C. §§ 7101–7135 (2012), when it refused to bargain with the Union over an alleged mid-contract change to the Master Agreement.

The Agency's position before the Authority was that it had no duty to bargain because consolidated relief rosters were covered by Article 18 of the parties' Master Agreement, which established procedures for assigning employees to the sick and annual relief rosters. The Authority rejected the Agency's position, holding instead that the Master Agreement gave no indication that the parties meant to foreclose bargaining over inter-institutional assignments. *U.S. Dep't of Justice, Fed. Bureau of Prisons, Fed. Corr. Complex and Am. Fed'n of Gov't Emps., Local 506*, 69 F.L.R.A. 447, 449 (2016). The agency now petitions this court for review.

In its petition to this court, the Agency argues that the court's decision in *BOP I*, 654 F.3d 91 (D.C. Cir. 2011), is controlling. In *BOP I*, we held that "Article 18 covers and preempts challenges to all specific outcomes of the assignment process." 654 F.3d at 96. This holding is directly contrary to the Authority's position in this case. The Authority argues that *BOP I* can be distinguished because, in this case, the parties'

bargaining history indicates that they did not contemplate consolidated relief rosters when they negotiated the Master Agreement and, in addition, they negotiated over the issue pursuant to a Settlement Agreement executed in 2010. The Authority's arguments are unpersuasive.

As *BOP I* makes clear:

Because the parties reached an agreement about how and when management would exercise its right to assign work, the implementation of those procedures, and the resulting impact, do not give rise to a further duty to bargain. Article 18 therefore covers and preempts challenges to all specific outcomes of the assignment process.

654 F.3d at 96. The Authority's decision in this case cannot be squared with this holding. It does not matter that the parties did not specifically contemplate consolidated relief rosters when they negotiated the Master Agreement. What matters is that consolidated relief rosters are clearly within the compass of Article 18. And it does not matter that the parties negotiated for a time over the issue after the Master Agreement was executed. Nor does it matter that the Agency agreed to additional negotiations pursuant to the Settlement Agreement. The Agency entered into the Settlement Agreement voluntarily, and made no concession that Article 18 does not cover the subjects about which it agreed to negotiate.

We hold, in accord with *BOP I*, that the subject of consolidated relief rosters is covered by Article 18 of the Master Agreement. We therefore grant the petition for review and reverse the decision of the Authority.

## I. BACKGROUND

The Agency operates FCC Coleman, a prison complex consisting of four institutions. The Agency and Union finalized the Master Agreement in 1998. Article 18 of the agreement, titled "Hours of Work," provided procedures for assigning correctional officers to quarterly work schedules. J.A. 79–86. Article 18(g) provided procedures for assigning those officers to sick and annual relief duty, which entailed covering for colleagues out on sick and annual leave. In 2009, the Agency notified the Union that, rather than continuing to have each institution in the complex handle its particular sick and annual leave-covering assignments from its own roster (as was the practice at the time), the Agency would consolidate the sick and annual relief rosters for all of FCC Coleman's institutions into one complex-wide roster ("consolidated relief roster"). This would entail assigning officers on that roster to any of FCC Coleman's four institutions ("inter-institutional assignment"), though they would be first used at their home institution if possible.

The parties negotiated over the consolidated relief roster for a time. After several months, the Agency terminated negotiations and the Union responded by filing an unfair labor practice charge. In 2010, the parties reached a settlement agreement pursuant to which the Agency agreed to bargain over "appropriate arrangements for employees affected by" the new policy. *U.S. Dep't of Justice*, 69 F.L.R.A. at 459; *see also* Supplemental Appendix 104–05. The Settlement Agreement made it clear, however, that the parties' "failure to comply with the terms and provisions of the agreement [would] result in the [unfair labor practice] Complaint(s) being reinstated." Suppl. App. 104. In other words, the Settlement Agreement did not bind the Agency to bargain to agreement or to impasse. Rather, it merely said that the unfair labor practice complaint against

the Agency would be reinstated if settlement negotiations failed.

After the Agency and the Union resumed negotiations, this court decided *BOP I*, which examined the scope of Article 18(d)'s provisions regarding bidding for quarterly rosters. 654 F.3d at 93. Like this case, *BOP I* arose from a union challenge to an Agency decision concerning relief rosters. *Id.* The Agency, facing a reduced budget, ordered that regular quarterly rosters would henceforth include only "mission critical" jobs. *Id.* Many jobs formerly assigned as quarterly roster posts were instead deemed "tasks" for officers on the relief roster, reducing Agency reliance on regular staff working overtime. *Id.* The union requested bargaining but the Agency refused, arguing that the "mission critical" standard was covered by Article 18. *Id.* The Authority sided with the union, concluding that Article 18 addressed only "procedures for filling specific positions" and not substantive matters such as "the impact . . . of eliminating certain positions." *Id.* at 94 (alteration in original) (internal quotation marks omitted). This Court disagreed.

The decision in *BOP I* plainly rejected the Authority's construction of Article 18 as limited to certain "types" of rosters. Rather, the court concluded that the parties to Article 18(d) and (g) had agreed on "the procedures by which a warden formulates a roster, assigns officers to posts, and designates officers for the relief shift," *id.* at 95, and, accordingly, "the implementation of those procedures, and the resulting impact, do not give rise to a further duty to bargain," *id.* at 96; *see also id.* (holding that "Article 18 therefore covers and preempts challenges to all specific outcomes of the assignment process").

More than a year after the decision in *BOP I* was issued, the Agency ended negotiations relating to inter-institutional assignment, asserting that *BOP I* established it had no duty to bargain over that issue. In response, the Union pursued the unfair labor practice charge at issue here. After an Authority regional director investigated and issued a complaint asserting that the Agency had engaged in an unfair labor practice, an administrative law judge ("ALJ") reviewed the charge and agreed with the complaint. The Agency filed exceptions to the ALJ's decision, and the Authority affirmed in a split decision. The Agency now petitions for review and reversal of the Authority's decision.

## II. ANALYSIS

### A. *Standard of Review*

This Court will set aside an order of the Authority if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *BOP I*, 654 F.3d at 94 (quoting *Nat'l Treasury Emps. Union v. FLRA*, 452 F.3d 793, 796 (D.C. Cir. 2006)); *see also* 5 U.S.C. § 7123(c) (2012). "[W]hether a subject is 'covered by' an existing agreement is a question of law." *Nat'l Treasury Emps. Union*, 452 F.3d at 797.

### B. *Mootness*

At oral argument, Agency counsel advised the court for the first time that the parties had executed a new Master Agreement in 2014. Oral Arg. Recording at 37:20–37:53. The court then ordered the parties to submit briefs addressing whether the execution of the new 2014 Master Agreement rendered all or any part of this case moot.

The Authority Order under review requires the Agency to (1) cease and desist from failing and refusing to bargain in good faith with the Union regarding the assignment of employees on the sick and annual relief roster of one institution to another; (2) bargain in good faith with the Union regarding such assignment of employees; and (3) post a notice declaring the Agency's culpability and pledging future compliance. In light of this disputed Order, we find that the case is not moot.

An order requiring an offending employer to post a notice typically "establishes that a live controversy still exists between the parties and that [the] case is therefore not moot." *Am. Fed'n of Gov't Emps., Local 3090 v. FLRA*, 777 F.2d 751, 753 n.13 (D.C. Cir. 1985). Remedial orders "need not be concerned solely with the isolated incident that precipitated an unfair labor practice charge. Rather, the NLRB and the FLRA have an obligation to protect the continuing right of employees to engage in concerted activity." *FLRA v. U.S. Dep't of the Air Force*, 735 F.2d 1513, 1517 n.8 (D.C. Cir. 1984); *see also NLRB v. Hiney Printing Co.*, 733 F.2d 1170, 1171 (6th Cir. 1984) (per curiam) ("[T]he posting of notices serves two purposes: advising the employees that the NLRB has protected their rights, and preventing or deterring future violations.").

If, in resolving this petition for review, we were to hold that the Agency violated the Statute during the lifespan of the expired Master Agreement, then the Authority's Order directing the Agency to post a notice of that violation would remain an appropriate form of relief for the Union. Our holding to the contrary secures for the Agency a reversal of the Authority's Order. Either way, a judicial disposition of this case will resolve a concrete dispute between the parties and afford meaningful relief to the prevailing party. Therefore, the case is not moot with respect to posted notice.

The same analysis applies with respect to the Authority's cease and desist order. It does not matter that the old Master Agreement has expired. In *NLRB v. Mexia Textile Mills, Inc.*, 339 U.S. 563, 567 (1950), the Supreme Court made it clear that, under the National Labor Relations Act, an "employer's compliance with [a cease and desist] order of the [NLRB] does not render the cause moot, depriving the Board of its opportunity to secure enforcement from an appropriate court." The same principle controls cases arising under the Statute. We confirmed this point in *Department of the Air Force*. The court noted that "[t]he rationale for [*Mexia*'s] rule is that cease and desist orders generally impose on employers a continuing obligation to refrain from violations of employees' rights. An enforcement decree ensures against future resumption of the unfair labor practice." 735 F.2d at 1516.

Because our disposition of this case will resolve a present, live controversy between the parties, the case is not moot. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189–91 (2000).

## C. *The "Covered-By" Doctrine*

The issue on the merits is whether the Authority misapplied the law in concluding that the subject of consolidated relief rosters was not covered by the Master Agreement and, therefore, that the Agency was obliged to bargain in good faith with the Union before implementing a new policy covering inter-institutional assignments. We reverse the decision of the Authority because it is directly at odds with this court's decision in *BOP I* and, thus, not in accordance with law.

The Authority concluded that the Master Agreement did not cover consolidated relief rosters for two reasons: (1) the

Agency and Union did not "contemplate" such rosters when bargaining over the Master Agreement and did not "intend[] to foreclose bargaining over inter-institutional assignments," and (2) the Settlement Agreement between the Agency and Union specifically provided for bargaining over such rosters. *U.S. Dep't of Justice*, 69 F.L.R.A. at 449–50. We find no merit in these conclusions.

> *1.  The Relevance of What the Agency and Union Contemplated When They Executed Their Master Agreement*

The Authority has acknowledged that "[a]pplication of the 'covered by' doctrine is an exercise in construction; it requires the adjudicator of a dispute over the meaning of a collective bargaining agreement to determine how broadly or narrowly the agreement should be read in view of the policies embodied in the [S]tatute." *Nat'l Treasury Emps. Union*, 452 F.3d at 797. It is therefore

> analogous to the inquiry we make in order to determine whether a federal statute impliedly preempts related state law; rather than focusing only upon the meaning of a particular word or words in search of congressional intent, as we might in a case of statutory interpretation, "the entire scheme of the statute must . . . be considered."

*Id.* (alteration in original) (citation omitted) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)) (contrasting "construction" and "interpretation").

Application of the covered-by doctrine does not rise or fall with reference to precise scenarios that the parties may or may not have envisioned when they executed their Master

Agreement. Such an approach would rest on a simplistic and naïve view of collective bargaining and of the purposes of the Statute. The Statute not only fosters good-faith bargaining between parties, it also seeks to ensure repose and stability in bargaining relationships. *See IRS v. FLRA*, 963 F.2d 429, 440 (D.C. Cir. 1992). If the obligation to bargain could be imposed whenever a party insisted upon reopening bargaining because it did not understand the full reach of the parties' agreement when it was executed, this would wreak havoc in bargaining relationships. "The [complaining party] would almost invariably prevail in duty to bargain cases, because it almost always could find some ambiguity in the relevant contractual language. The result would be an endless duty to bargain on the part of the [parties], with a resultant evisceration of the [Statute's] policies of contractual stability and repose." *Id.*

The Authority's decision says that "the [Agency] has failed to establish that the parties, at either the national or local level, intended to foreclose bargaining over inter-institutional assignments." *U.S. Dep't of Justice*, 69 F.L.R.A. at 449. This seems to suggest that the crucial question is whether a party contemplated every scenario that might arise under the terms of the Master Agreement. This makes no sense because it would effectively eviscerate the covered-by doctrine. What matters is whether a reasonable construction of the agreement indicates that the disputed subject is within the compass of the agreement. "For a subject to be deemed covered, there need not be an 'exact congruence' between the matter in dispute and a provision of the agreement, so long as the agreement expressly or implicitly indicates the parties reached a negotiated agreement on the subject." *BOP I*, 654 F.3d at 94–95.

The parties' intent may be relevant as an indicator of the scope of an agreement. This is very different, however, from determining whether the parties intended particular outcomes

in the application and enforcement of their agreement. The Authority's position confuses issues of contract "interpretation" with issues of contract "construction." "Application of the 'covered by' doctrine is an exercise in construction." *Nat'l Treasury Emps. Union*, 452 F.3d at 797. "'[C]onstruction' 'determines [the] legal operation' of agreement; 'interpretation' of agreement resolves any ambiguity in terms used." *Id.* (alteration in original) (quoting *Garden State Tanning, Inc. v. Mitchell Mfg. Group, Inc.*, 273 F.3d 332, 335 (3d Cir. 2001)).

As noted above, construing collective bargaining agreements as covering only those outcomes the parties concretely foresaw would make extensive future bargaining inevitable, removing the parties' incentive to try to comprehensively bargain in the first place. Promotion of contractual repose is needed to avoid "discourag[ing] [parties] from engaging in the effort, as part of negotiation of their basic collective bargaining agreement, to foresee potential labor-management relations issues, and resolve those issues in as comprehensive a manner as practicable." *Dep't of the Navy*, 962 F.2d at 59 (alterations in original) (quoting *IRS and Nat'l Treasury Emps. Union*, 17 F.L.R.A. 731, 736 (1985)). We have therefore consistently held that whether the parties intended a particular outcome does not resolve the "covered-by" analysis. Instead, what matters is whether the policy falls within the scope of the collective bargaining agreement in light of the Statute's policy of encouraging such agreements by fostering their stability and repose.

To that end, the scope of what is covered must be construed to give the parties the benefit of their bargain. And if the parties' bargain encompasses the implementation of a new policy, then the new policy is deemed covered by the agreement. *Department of the Navy*, *BOP I*, and *National*

*Treasury Employees Union* all illustrate this principle. In *Department of the Navy*, a dispute arose over whether the Marine Corps' temporary assignment ("detailing") of four employees was covered by a Master Labor Agreement ("MLA") that set forth procedures for detailing employees. 962 F.2d at 51. The Authority held that the particular detailing of those employees was not covered because the MLA "did not contain the *whole 'universe' of possible conditions* that might pertain to the impact and implementation of employee details" and "did not 'even attempt to deal with the impact and implementation of *specific individual details.*'" *Id.* at 58 (quoting *Dep't of the Navy, Marine Corps Logistics Base and Am. Fed'n of Gov't Emps.*, 39 F.L.R.A. 1060, 1069 (1991)); *see also id.* at 52 ("[T]he Authority held that the MLA did not 'specifically address' the 'particular subject matter' of the union's bargaining request—*i.e.*, the impact of the 'detail' on the four affected employees—because the Agreement did not contain provisions regarding the 'implementation of *individual details* on the local level.'" (quoting *Dep't of the Navy, Marine Corps Logistics Base*, 39 F.L.R.A. at 1067)).

On the agency's petition for review, we rejected the Authority's use of a "covered-by" standard that compelled bargaining "unless the collective bargaining agreement *specifically addresses the precise matter at issue*," 962 F.2d at 57, because "it would have required near-supernatural prescience for the parties to have foreseen, at the time of drafting the MLA, what implementation issues would arise with respect to 'specific individual details' that had not even been conceived, much less implemented, at the time," *id.* at 59. Such an approach would undermine the Statute's goal of "promot[ing] collective bargaining and the negotiation of collective bargaining agreements," as collective bargaining is encouraged if and only if the parties to such agreements can rely on "stability and repose with respect to matters reduced to

writing in the agreement." *Id.* If the parties cannot rely on those agreements applying to prospective matters not specifically foreseen but falling within the agreement's scope, they will get mired in "essentially endless bargaining" as each new specific outcome arises. *Id.*; *see also id.* ("[T]he Authority's counsel candidly admitted that he could think of no circumstance in which the Marine Corps could 'detail' an employee without being required to bargain."). The Authority's approach deprived the agency of "the benefit of its bargain" with the union by forcing it to "bargain anew regarding the same matters already addressed in the agreement." *Id.* at 60.

*BOP I* applied the principles enunciated in *Department of the Navy* to the same article of the Master Agreement that is at issue here. There, the Authority concluded that, although the Agency had not been accused of violating the Article 18(d) procedures for formulating the rosters that implemented the "mission critical standard," the standard was not covered by Article 18(d) because the article addressed only procedure, and did not "address[] the impact . . . of eliminating certain positions." *BOP I*, 654 F.3d at 94 (alterations in original). We rejected that conclusion, noting that "[t]he Authority erred insofar as it held negotiated procedures such as those in Article 18 cannot cover decisions about substance. In fact that is exactly what § 7106 of the Statute contemplates." *Id.* at 96 (citing *Dep't of the Navy*, 962 F.2d at 50, 61–62). Indeed, "[b]ecause the parties reached an agreement about how and when management would exercise its right to assign work, the implementation of those procedures, and the resulting impact, do not give rise to a further duty to bargain. Article 18 therefore covers and preempts challenges to all specific outcomes of the assignment process." *Id.*

We observed in *BOP I* that "[p]erhaps the best evidence Article 18 covers the mission critical standard" was the

testimony of the union's lead negotiator that Article 18 "place[d] procedural checks upon the Bureau's authority to assign work, including the advance publication of available posts, the solicitation of bids, and a limited right to appeal an assignment." *Id.* This confirmed that the argument over "how and when management would exercise its right to assign work" – which the parties resolved through the compromise language of Article 18 – was the impact and implementation bargaining the union was owed. *Id.* The same is true here: The Union could have negotiated for an Article 18 provision that contained a caveat that assignments changing an officer's duty station to a different institution in FCC Coleman would not comply with the article; it did not.

In *National Treasury Employees Union*, the collective bargaining agreement at issue provided that the Internal Revenue Service ("IRS") would resolve conflicts over requests to schedule annual leave based on employee seniority. 452 F.3d at 794–95. The union proposed a new policy permitting employees to "swap" leave, but the IRS refused, contending that the existing collective bargaining agreement covered the matter. *Id.* at 795. An arbitrator concluded that the bargaining agreement did not cover leave-swapping because it "only govern[ed] how the agency will initially assign annual leave" and did not "speak to the situation in which an employee chooses not to use approved leave." *Id.* (internal quotation marks omitted). The IRS appealed to the Authority, which held that the arbitrator erred. Under the union's approach, "an employee with leave approved on the basis of his seniority could trade that leave to an employee other than the next most senior employee who had requested, but was denied, leave for that same period," which the Authority realized would circumvent the seniority system. *Id.* at 797. Because the collective bargaining agreement "had established seniority as the sole criterion upon which employees would qualify for

leave," the Authority deemed the proposed leave-swapping policy covered by that agreement, a conclusion this court called "eminently reasonable." *Id.* at 798.

Like the detail assignments in *Department of the Navy*, and the rosters formulated using the "mission critical" standard in *BOP I*, the consolidated relief rosters in this case are outcomes not necessarily intended at the time when the parties negotiated their Master Agreement. Nevertheless, consolidated relief rosters are clearly within the scope of the assignment procedures covered by Article 18. Like the leave provision in *National Treasury Employees Union*, Article 18(g) is the last word on the subject it addresses (relief rosters), and cannot be circumvented merely because one of the bargaining parties did not anticipate a policy it might produce. Where the Authority erred in *BOP I*, and here, was in concluding that negotiation of the procedures for assigning work does not cover all assignments devised in compliance with those procedures.

### 2. *The Settlement Agreement*

The Authority's decision also relied on the 2010 Settlement Agreement, pursuant to which the parties held multiple negotiation sessions between February 3 and June 17, 2011, meeting again on December 1, 2011 and May 29, 2012, finally ending in August 2012, over a year after *BOP I* issued. The Authority's decision states that it had previously "declined to find a matter covered by a collective-bargaining agreement where the agreement specifically contemplates bargaining to resolve the matter." *U.S. Dep't of Justice*, 69 F.L.R.A. at 450. The Authority erroneously relied on cases in which collective bargaining agreements required bargaining under certain circumstances, see *id*. at 450 n.43 (citing *U.S. Dep't of Justice*, 68 F.L.R.A. 580, 582 (2015), to conclude that "the plain language of the parties' *settlement agreement* satisfies this

requirement." *Id.* (emphasis added). In other words, the Master Agreement covers consolidated rosters, says the Authority, because the parties agreed to negotiate further in the Settlement Agreement. This is a specious line of reasoning.

The Authority's reasoning makes no sense because the Settlement Agreement did not amend the Master Agreement. Indeed, neither party even suggests this. And the Master Agreement surely did not "contemplate bargaining" over consolidated relief rosters. Therefore, the "covered-by" issue cannot be resolved by reference to the Settlement Agreement. The construction of the Master Agreement is what is at issue in this case.

Furthermore, the Authority's view of what the Settlement Agreement says is simply wrong. The Agency entered the Settlement Agreement in response to the unfair labor practice charge that had been filed by the Union. The Settlement Agreement called for further negotiations over consolidated rosters, but contained no concessions as to the scope of Article 18. Indeed, the sole remedy for the Agency's failure to pursue negotiations under the Settlement Agreement was reinstatement of the unfair labor practice complaint. That is what happened when the Agency discontinued bargaining with the Union. As a result, the "covered-by" issue still had to be resolved by reference to the Master Agreement, not the Settlement Agreement.

Finally, it is of little moment that the parties attempted to negotiate over the new consolidated relief rosters. As noted at the outset of this opinion, the Agency's willingness to discuss a matter with respect to which it had no duty to bargain did not negate its right to raise the covered-by doctrine in the unfair labor practice proceedings before the Authority.

## III.  CONCLUSION

For the reasons set forth above, we grant the petition for review and reverse the Authority's decision.

*So ordered.*